2025 IL App (1st) 230771
May 16, 2025

FIFTH DIVISION

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | 18 CR 05203 |
| v. | ) ) ) | The Honorable James B. Linn, |
| RICHARD JONES, | ) ) | Judge, presiding. |
| Defendant-Appellant. | ) | |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion
Presiding Justice Mikva and Justice Navarro concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant Richard Jones, age 23, was convicted after a bench trial of the second degree murder of Anthony Houston, age 50, and sentenced to 18 years with the Department of Corrections (IDOC). On this direct appeal, defendant argues (1) that the trial judge, as factfinder, erroneously rejected his self-defense claim; (2) that, even if the evidence against defendant was sufficient, the State erred in closing argument by allegedly misstating the law of self-defense; (3) that the trial judge erroneously admitted the victim's 911 call under the excited utterance exception to the rule against hearsay; and (4) that the trial judge erred in

considering the victim's status in the community during defendant's sentencing. For the following reasons, we do not find these arguments persuasive and affirm.

¶ 2                                    BACKGROUND

¶ 3                                    I. Fact Summary

¶ 4          Based on the record from the trial court, the following factual summary emerges.

¶ 5          Armed with a knife, defendant walked over to the apartment building where the victim lived and started banging on the front door, while yelling and cursing. Witnesses observed defendant trying to gain entry into the building by touching the keypad. The victim, who lived in a first-floor apartment near the front door, called 911 and asked for police to come immediately because a young man was threatening him and staff.

¶ 6          The building had a number of units occupied by residents of, and staff employed by, Thresholds, an organization that provides group housing for people who cannot live on their own. The victim, who was a Thresholds employee, informed the 911 operator that defendant's girlfriend lived in the building. After the 911 call, the victim opened the front door and pepper-sprayed defendant. Nevertheless, defendant forced his way into the building, and the two men started fighting. During the altercation, the victim was stabbed multiple times and exhibited no signs of life by the time police arrived. Once at the police lockup, police observed some cuts on defendant's back. The cuts were bandaged, but defendant refused any medical treatment.

¶ 7          Defendant was indicted for first degree murder and opted for a bench trial. At trial, defendant claimed self-defense. The trial court found defendant guilty of second-degree murder, rather than first degree murder, because it found that defendant had a genuine but unreasonable belief in a need for self-defense.

¶ 8                                    II. Trial Evidence

¶ 9　　　　Although we can summarize the events in a few short paragraphs, the devil is in the details. Thus, we describe below the trial evidence that forms the basis of this appeal.

¶ 10　　　　　　　　　　　A. The 911 Call Audio Recording

¶ 11　　　　Among other things, defendant challenges the admission of the audio recording of the 911 call made by the victim. The tape records the words of the call, as well as some of the paralanguage, such as breath intakes and pauses. Although the call is less than two minutes long, the victim repeated a couple of times that defendant is "threatening me."

¶ 12　　　　Upon listening to the recording, we heard the following. Immediately after the 911 operator answered, there was a sharp intake and exhale of breath. The victim then asked the 911 operator to send a police car to his address because "I got a young man over here threatening me." Before providing the address, the victim paused briefly and said "ah," and one can hear the gulp of air. The victim said defendant was "at the door now." When asked by the operator what "the relationship was between you two," the victim replied that defendant's girlfriend lived there and defendant was "coming over here threatening staff." When asked if there were "any weapons," the victim had another sharp intake of breath and replied, "I don't know," stuttering over the word "don't." The victim said that defendant was ringing the phone now. When the operator asked if this location was a business, the victim answered that it was "Thresholds," and the victim later explained that he was part of the staff. After the operator asked what the defendant was wearing, the victim's intake of breath was audible, before he answered that defendant was wearing a black hoodie. When the operator asked about defendant's girlfriend, the victim said, "he's not doing anything to her." The victim begged the operator: "Can you help, please." The operator explained that she had already notified the

police and that she was asking questions for the purpose of providing them with more information. The victim repeated: "He's over here threatening me though."

¶ 13    In his appellate brief, defendant acknowledges that the victim stated at the beginning of the call that he did not know whether defendant had a weapon. However, defendant claims that, at the end of the call, the victim "confirmed" that defendant did not have any weapons. Toward the end of the call, what the operator asked was "the girlfriend, no weapons, he's not doing anything to her." The victim's assent appears to be solely about the girlfriend, because the victim responded, "no, he's not doing anything to her. He's threatening me though."

¶ 14    Immediately prior to the start of the trial, the defense moved to suppress the audiotape on the ground that the events preceding the call were "not sufficiently startling enough to produce a spontaneous and unreflecting statement." Because it was a bench trial and the trial was about to begin, the court took the motion under advisement and deferred ruling until the tape was played at the trial. After the tape was played, the court found that the victim "sounded pretty scared. He sounded tense, nervous, anxious, wanting the police there right now." After stating "he sounded very excited to me," the trial court admitted the statement as an excited utterance.

¶ 15                                  B. The Neighbors' Testimony

¶ 16                                  1. Bustillo

¶ 17    Gisselle Bustillo testified that, in 2018, when this incident occurred, she was a medical student living with her boyfriend, Badea Akel, and their two dogs in the Chicago apartment building where this offense occurred. Their first-floor apartment was next to the victim's apartment, and the victim's apartment was next to the front door. At 5:25 p.m. on March 13, 2018, she and her boyfriend took their two dogs out for a walk. Rather than exiting the front

door, they exited through the mailroom. Before exiting the mail room, they heard "a loud noise, like someone banging on a door." They walked toward the front lawn of the building and paused there while the dogs relieved themselves. Once on the front lawn, Bustillo observed defendant banging loudly on the front-entrance door with his fist, yelling, and repeatedly "mess[ing]" with the keypad in an apparent effort to gain entry. Although she could not understand what he was saying, he appeared angry. Bustillo testified that defendant was steadily pounding on the door with his fist. During the six months to a year that she had then been living in the building, she had not seen him before.

¶ 18        Bustillo testified that the door that defendant was banging was the door that was closest to the victim's apartment. As Bustillo and her boyfriend walked away from the building with their dogs, they kept looking over their shoulder to ensure they were "not in harm's way." At some point, Bustillo observed the door open, but she could not discern the face of the person who opened it. Through the glass window in the door, she could see a tall Black male inside, and she could see defendant enter.

¶ 19        Bustillo testified that she moved to the side to make sure she was not in harm's way, and she "saw two male figures move [*sic*] shuffle back and forth." She saw the man who opened the door "make a motion of extending a hand forward," but she did not see what was in his hand. As she was watching the events through the glass window in the door, she did not see a knife. She saw the door open again, and defendant stumbled out, fell to his knees and put his face in the snow on the ground. The victim stood at the door, with his hand on the left side of his neck, yelling "help me." The victim had blood all over his left shoulder. After indicating to the victim that she was calling 911, Bustillo ran to the back of the building with her boyfriend and their dogs, and they all headed toward their apartment. Her boyfriend told her to stay in

the apartment until he determined it was safe. When he returned to their apartment, he said he needed help. After entering the victim's apartment, she saw the victim sitting on the floor, with his back against the couch, holding the left side of his neck, and there was a lot of blood. Bustillo was still talking on the phone to the 911 operator. Before entering the victim's apartment, she had observed a knife on the floor, just outside his apartment door. While waiting for the police to arrive, she attempted to perform cardiopulmonary resuscitation. When Bustillo heard the police arrive, she ran to the front door and met a female police officer, whom Bustillo directed to the victim's apartment.

¶ 20     The parties then entered into a stipulation regarding a five-minute surveillance video of the building and agreed that it was "a true and accurate video recording of the events that occurred outside" of the building "on March 13th, 2018, beginning at approximately 5:20 p.m." The video depicted defendant's arrival, occurring just before Bustillo and her boyfriend arrived by the front lawn and showed Bustillo and her boyfriend briefly, before they also went out of frame.

¶ 21     During Bustillo's cross-examination, the parties stipulated that Bustillo's prior written statement said that defendant was "mumbling," and the statement did not use the word "yelling." Defendant argued this was impeachment by omission. On cross-examination, Bustillo testified that she did not see a weapon in defendant's hand and that she did not call 911 during the time when defendant was trying to gain entry.

¶ 22     When asked if the victim pepper sprayed defendant after opening the door, Bustillo replied: "I do not know if he pepper sprayed. I saw him extend his right arm towards the person that entered." When asked if this gesture occurred immediately after the door opened, she stated that it happened within seconds. Bustillo was then asked if she told officers on the scene

that the victim had pepper sprayed defendant. She replied that she did not recall her exact words but, if she said that, it was because she could smell the pepper spray while she was being interviewed. When asked if she could smell the pepper spray when she was outside, she said no. The defense then played a video clip from an officer's body camera, which depicted Bustillo saying that the victim pepper sprayed defendant. Defense counsel then asked: "After you saw the decedent pepper spray the individual at the door, the individual at the door went inside, correct?" To which, Bustillo replied: "I think this happened simultaneously." Bustillo agreed that, to enter the building, one needed a key or a code.

¶ 23        On redirect examination, Bustillo testified that she could not tell at the time whether the victim had actually pepper sprayed defendant. However, later, when she entered the building, she could smell it. When Bustillo talked to the police, she described defendant as upset. When asked why, she said that she responded "the tone of voice, the loudness, the uttering, the muttering, the making [of] incomprehensible noises, and banging very loudly on the door." Bustillo confirmed that defendant was also yelling.

¶ 24                                        2. Akel

¶ 25        The next witness was Badea Akel, Bustillo's boyfriend, who testified that back in 2018 he was a medical student living in Chicago with Bustillo. At 5:20 p.m. on March 13, 2018, the two of them took their dogs out, and he observed defendant at the front of the building, "knocking aggressively and using provocative language." Defendant seemed angry or upset and was using curse words. The victim approached the door, stuck out his hand, "and possibly sprayed" defendant. But Akel said that, with respect to what the victim was holding, "we couldn't make [out] what it was at that time." Defendant then "forced his way into the building"

by pushing, and the door closed. Through "a foot-by-foot window" in the door, Akel could see a physical altercation between the two men.

¶ 26        Akel testified that, after the altercation, the door opened and defendant exited, throwing himself on the ground and covering his face with snow. The victim also came out with his hand on the left side of his neck, bleeding profusely and asking for help. Bustillo then signaled that she was calling the police. As Akel and Bustillo headed back toward their apartment, Akel saw the victim in the hallway stumbling toward his apartment and asking for help, so Akel went to the victim's apartment. On the floor outside of the victim's apartment, Akel saw a bloody knife. Bustillo joined him after a minute, and they were able to sit the victim down on the floor. Akel and Bustillo put on gloves and applied pressure to the wounds, but the victim collapsed and was unresponsive. When Bustillo exited the victim's apartment to meet the police, Akel was able to see a commotion through a window and saw defendant outside with police officers.

¶ 27        When asked how defendant had knocked on the door, Akel said that defendant was "[h]ammering the door," and Akel gestured. The court then stated for the record: "Indicating with his right fist in a banging fashion."

¶ 28        On cross-examination, defense counsel stated that the victim "came out and maced the person" who was knocking on the door, and Akel responded "[t]hat's correct." Akel was also asked, "when you were outside during the altercation, you actually were able to smell the pepper spray or mace that had been dispersed," and Akel replied, "[t]hat's correct." Because Akel observed the altercation through a window high on the door, he saw only the victim's head going back and forth, as the victim was taller. From this observation, Akel deduced there must be a physical altercation. Akel did not observe either defendant or the victim with a knife in his hand.

¶ 29                              C. The Responding Police Officers

¶ 30                                    1. Officer Wilson

¶ 31        Officer Elizabeth Wilson testified that she was a 25-year veteran with the Chicago Police Department. On March 13, 2018, she was working in uniform and in a marked squad car with her partner, Officer Leslie Watkins, when they were dispatched to an assault in progress. About a block away from the address given, Wilson observed defendant, who was "erratically speaking." After exiting her vehicle, Wilson asked defendant if he was okay, and he asked if he could have her gun because he "want[ed] to kill him." Wilson and her partner continued to the apartment building, where they observed a lot of blood on the ground by the front door. The officers were able to open the front door without anyone opening it for them.

¶ 32        Wilson testified that, once inside the vestibule, she observed blood on the floor. From the vestibule, there was a second set of doors leading into a hallway, where a woman met them. When Wilson entered the victim's apartment, the victim was lying down, with a lot of blood on his face, and exhibiting no signs of life. Wilson then exited the building to try to find defendant, because she now "realized the story." When Wilson found defendant outside the building, "he was being erratic and saying he still wanted to kill somebody," so she handcuffed him. While they waited for transport, defendant said "I want to kill that guy[;] he raped" S.B.

¶ 33        Wilson testified that, when she arrived at the building, she activated her body camera and that she had reviewed the video footage. Among other things, the video shows defendant screaming several times "he raped [S.B.]," immediately before being cuffed, while being cuffed, and after being cuffed. Aside from the knife near the victim's apartment door, Wilson did not observe any other knives or weapons.

¶ 34       On cross-examination, Wilson did not recall whether she used a knife to open the door or whether she kicked it, but she was able to open the door fairly quickly and easily. She recalled that the pepper spray in the air was making her cough.

¶ 35       2. Detective Adrian Garcia and Defendant's Statement

¶ 36       Detective Adrian Garcia testified that he had been a Chicago police detective for 25 years. On March 13, 2018, he was assigned to investigate this homicide. At the apartment building, he observed blood at the front door, in the vestibule, and along the hallway. Outside the victim's apartment door, he observed a knife, and inside the apartment, he observed the deceased victim. Back at the police station, Garcia encountered defendant in the lockup, where defendant consented to a videotaped interview.

¶ 37       On the video, Garcia advised defendant of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). After receiving and acknowledging his rights, defendant asserted that "he" was "raping [S.B.]" and that S.B. lived in the building. When officers asked defendant what happened today, defendant said: "I finished the job." Defendant explained: "Today, I just felt like he needed to die" because he was a "rapist" and "he's heinous." Defendant went to the building and rang the doorbell, and the victim pepper sprayed him. Defendant pulled out his "blade," and the victim grabbed the blade and stabbed defendant in the back. Defendant grabbed the knife back and stabbed the victim. When asked if he was sorry for what he had done, defendant replied, "no, I wish he could die." Defendant said the victim raped S.B. approximately two months ago. Defendant said he lived next door to Thresholds, by himself.

¶ 38       After the interview, the officers exited, and subsequently five officers entered the interview room in order to take swabs of blood on both defendant's hands and to take photos to document where they were swabbing. They asked if, besides his back, he had any other cuts

on his body, and he said no. As they exited the room, the police informed him that they would return to take him to the hospital, but he said he did not want to go. The police responded that he would have to tell that to the people at the hospital.

¶ 39      After the video was played in court, Garcia's testimony resumed. Garcia testified that he observed an injury to defendant's shoulder or back, and he identified postarrest photos of defendant, which depicted cuts to the back of defendant's left shoulder.

¶ 40      On cross-examination, Garcia testified that, when he entered the vestibule, there was a container of pepper spray or Mace. When defendant refused to go to a hospital, members of the Chicago Fire Department placed a bandage and tape on his injuries. They returned "because the watch commander of the district was not going to permit us to leave him in a lockup without him seeing a doctor at a hospital." At the hospital, defendant "refused any medical treatment," and he returned to the police station.

¶ 41      The parties stipulated that "crime scene marker one" on the hallway floor outside the victim's apartment was "a black Sabre mace container" and that "crime scene marker two" on the vestibule floor was "a black cap."

¶ 42      The trial court then asked questions about whether there was a person named S.B., and Garcia responded that one of the detectives interviewed her.

¶ 43                          3. Sergeant Duong

¶ 44      Sergeant Jim Duong testified that he had worked for the Chicago Police Department for 12 years. On March 13, 2018, at 5:30 p.m., he and his partner, Officer Marvin Eng, responded to the offense in question, in a marked squad car and in uniform. Duong knew the victim prior to that day, because Duong filed missing case reports for him, in connection with

Thresholds. Duong explained that Thresholds was "a group home for kids" and that the victim was one of its staff members.

¶ 45    Duong testified that, when he arrived at the scene, defendant was acting erratic and shouting out things. While Duong accompanied defendant in a transport vehicle, defendant uttered that the victim had pepper sprayed defendant, and defendant stated, "I'll kill him." The State then played a 30-second clip from Duong's body-cam footage. Duong identified a window to the right of the front door as part of the Thresholds office where the victim worked.

¶ 46    On cross, Duong testified that, on March 13, 2018, defendant was five feet, six inches tall and 170 pounds.

¶ 47                                    D. Stipulations

¶ 48    The parties stipulated that, if S.B. were called to testify, she would testify that on March 13, 2018, she was 21 years old, that she lived at Thresholds, that the victim helped her become independent and with daily life skills, that she had known defendant since she was 15 or 16 years old, that "she never had a physical dating relationship" with the victim, and that the victim "never raped her."

¶ 49    The parties stipulated that the forensic pathologist who performed the autopsy on the victim, if called to testify, would testify that the victim had eight stab wounds and three incise wounds and that his death resulted from multiple sharp force injuries. One of the stab wounds was a horizontal wound, along the left side of his neck and face, that perforated the victim's left carotid artery and left jugular vein and was two inches deep. Another stab wound, which was 2¾ inches deep, was also on the left side of the neck and also perforated the left carotid artery and left jugular vein. A certified copy of her report was marked as an exhibit, and her

report noted that the victim weighed 241 pounds, was six feet tall, and was reported to be 50 years old.

¶ 50    The parties stipulated that a fingerprint expert examined the knife found in the hallway but found no latent prints suitable for comparison. The parties further stipulated that DNA evidence obtained from blood on defendant's right hand contained a mixture of two people's DNA including a major profile from which defendant cannot be excluded and a minor profile from which the victim cannot be excluded. The same was true regarding the blood on defendant's left hand. Various stains on the knife were also tested with various results.

¶ 51                              E. The Defense Case

¶ 52                                  1. Thorne

¶ 53    James Thorne testified that he was 46 years old, a high school graduate, and a certified house insulator. Thorne was currently employed as a lead machine operator. In January 2008, he worked for the State of Illinois at the Howe Center, which houses individuals with developmental disabilities. At that point, he had worked there for eight years. As a "mental health tech." his duties were to assist the individuals living there with their daily activities. The victim was a coworker, and Thorne hung out with him and some other coworkers outside of work.

¶ 54    Thorne testified that on January 31, 2008, at 4 p.m., Thorne had a disagreement with the victim, and the victim pushed Thorne. They parted, but the victim returned and said to meet him later that evening at the Speedway Gas Station. Thorne "took it as we were going to have an altercation." Later, Thorne said to meet behind Hickory Hall, which was on the campus of the Howe Center. The victim said he did not come by himself, and Thorne noticed that the victim was holding a steak knife, approximately five or six inches long. Thorne thought it was

going to be a fistfight, but he reached into his pocket for the miniature pocketknife that he carried in his back pocket. During the fight, the victim slammed Thorne's head on the trunk of the car, Thorne fell and dropped his knife, and the two fought over the steak knife. Thorne was able to twist the knife out of the victim's hands. Coworkers appeared and stopped the fight. On cross-examination, Thorne conceded that he pled guilty to unlawful use of a weapon in connection with the fight.

¶ 55                                    2. Defendant

¶ 56                               a. Direct Examination

¶ 57        Defendant exercised his right to testify and acknowledged going to the Thresholds building, fighting with the victim, and stabbing him. His testimony thereby eliminated any issues of identity and focused the trial squarely on his assertion of self-defense.

¶ 58        Defendant testified that he was, at the time of trial, a 28-year-old high school graduate. In 2018, he was 23 years old, weighed approximately 180 pounds, and was five feet and six inches tall. In March 2018, he was staying with a friend who lived next door to the Thresholds building. Defendant explained that Thresholds had apartments in the building where the offense occurred and, specifically, that the lower floors housed young adults over the age of 18. Defendant estimated that approximately 12 Thresholds staff members also lived there.

¶ 59        On the day of the offense, defendant went to the building to visit a friend, and he knocked and rang the doorbell for two or three minutes. Defendant agreed that he became frustrated after knocking for several minutes. When the victim came to the door, defendant testified: "he pepper sprayed me immediately." Defendant clarified that the victim opened the door and then "reached out and pepper sprayed me." Defendant stated: "We got to fighting right there and then we got to tussling inside of the building." Describing the fight, defendant

said that the victim was choking him, that defendant tried to head for the door, that defendant's knife "dropped," that the victim stabbed defendant in the back, and that defendant then gained control of the knife.

¶ 60     With respect to the knife, defendant testified that it was his pocketknife, that he carried it because he had "a lot of people that don't like me," and that he carried it to protect himself. Defendant testified that the knife "fell" and the victim grabbed it off the floor and stabbed defendant in his right shoulder.[1] Defendant regained control of his knife by kicking the victim in the groin. Once in control of the knife, defendant said, "I got to swinging rapidly trying to get him out of my way, and he pushed me to the wall towards the door, and I ran out the door." Defendant had no idea how many times he swung the knife and stated, "I couldn't see nothing really but a blurred figure in front of me." After exiting the building, defendant immediately put snow on his face and swallowed some snow, in order to address the "blazing" hot sensation from the pepper spray.

¶ 61     Defendant testified that, when the victim stabbed defendant in the back, the victim "actually said" that defendant knew what the victim "did" to S.B. Defendant had met S.B. through "UCAN."[2] Defendant "conclude[d]" that the victim had raped S.B. based on an incident that occurred a month or two before the offense. Defendant explained that the victim had closed the door during what otherwise "could have just been a routine bed check." When the victim closed the door, defendant was "talking to her by her window smoking." S.B. was inside her room, and defendant was standing outside. When the victim closed the door,

---

[1]The photos in the record depict cuts to defendant's left shoulder.
[2]UCAN is an organization that provides a range of services for youth and families in Chicago.

defendant said "hey," and the victim looked at defendant and then shut the windows and blinds on defendant. This occurred at 8 or 9 at night.

¶ 62        Defendant testified that, on March 13, 2018, he did not go to the building with the intent to kill the victim or to confront him about S.B. Defendant did not say or do anything to the victim before the victim pepper sprayed him. The victim stabbed defendant first. Defendant did not say that he wanted to kill the victim, until after the victim had pepper sprayed and stabbed defendant. Defendant did not have his knife out before the victim pepper sprayed him.

¶ 63                                b. Cross-examination

¶ 64        On cross-examination, defendant testified that he did not immediately think that the victim was raping S.B.; rather, defendant thought that after the victim made a remark during the altercation. When defendant went to the building on March 13, 2018, he was going to see a former girlfriend who lived there, who was not S.B. The girlfriend was a Thresholds resident, and he had been seeing her, on and off, for a couple of months. They would also talk on the phone. On March 13, 2018, he did not try to call her when he was at the door, because they had broken up and he went to return her ring. When he arrived at the building, he pressed the buzzer for Thresholds, which would then ring on the Thresholds phone. Although he saw two people walking their dogs, he did not ask them to let him in because that would have been trespassing.

¶ 65        Defendant testified that, when the victim pepper sprayed him, defendant did not back up, because he could not see and the victim was big, so defendant "just started swinging." Neither defendant nor the victim said anything before the victim used the pepper spray. Defendant acknowledged that, after the incident, he said that, if the victim had not pepper

sprayed him, defendant would have killed him. Defendant also acknowledged that he said to the detectives that the victim needed to die because he was a rapist.

¶ 66        On cross-examination, defendant testified that, after he was pepper sprayed, he pulled out his knife "trying to get to the door" because the victim was bigger. Defendant stated that he was "[f]ighting through" the door. The fight started outside and continued inside the vestibule. Defendant agreed that the knife did not fall out of his pocket but rather that it fell as they were fighting. After the fight and after defendant had eaten some snow, the victim was calling for help, and defendant said he "was calling for help too." After defendant was arrested, he told paramedics that he did not want to be treated, and at the hospital, he told the doctors there that he felt fine and did not want any treatment.

¶ 67        After exhibits were formally moved into evidence, the parties rested, and the trial proceeded to closing argument. During the State's argument, the defense objected several times to alleged misstatements, and the court ruled that that it was merely argument. At one point after an objection, the court said. "[l]et him argue his case, please."

¶ 68                          III. The Trial Court's Factual Findings

¶ 69        After listening to the evidence and the parties' arguments, the trial court stated its factual findings. The court found that defendant "came there with the knife." When defendant arrived, "he's out there acting crazy." The court stated that it had listened to the 911 call placed by the victim and that the court affirmatively rejected the defense's characterization of the victim's tone of voice as calm. The court found: "I don't think he sounded calm at all. I think he sounded very stressed."

¶ 70        The court observed that the two witnesses who observed defendant thought "he was acting in a very irrational fashion." After discussing their testimony and the 911 call, the court

found that defendant was "aggressive" and "was perceived to be threatening" as he banged on the door and demanded to be let in. Defendant "came there already in some kind of agitated state."

¶ 71        With respect to the issue of which came first, the pepper spray or the knife, the court found: "I am not exactly clear as to the sequence as to whether the knife came first, or the spray of pepper came first. That is not entirely clear to me. It seemed to happen very close in time to each other ***." Later, the court stated: "Pepper spray was involved maybe before, unclear exactly how much before or maybe almost simultaneously the pepper spray was involved." The court concluded: "a struggle happens, and a knife is involved and ultimately [the victim] is stabbed" fatally.

¶ 72        With respect to defendant's injuries, the court noted only that defendant "got some injuries, nothing like what [the victim] suffered." The court did not find what defendant's injuries were or exactly how they occurred. Using the passive voice, the court found "a slashing took place" without stating who the perpetrator of the slashing was, but it appears to be defendant, because the court went on to observe that the victim's injuries were far more serious than defendant's and ultimately the cause of the victim's death.

¶ 73        Afterwards, when the police arrived, defendant was talking about the justifications for his actions. The court found: "Whether it's pepper spray or his illusion about [the victim] having raped [S.B., a resident]. And the way it was described to me, the basis for those thoughts do not appear to be clear or reasonable, but he's agitated, and he felt justified."

¶ 74        Ultimately, the court found defendant guilty of "the lesser-included offense of murder in the second-degree."

¶ 75                                    IV. Sentencing

¶ 76    On March 27, 2023, the trial court denied defendant's posttrial motion for a new trial. On April 17, 2023, a sentencing hearing was held. The State read into the record a statement by the victim's sister, and the defense submitted a mitigation report.

¶ 77    By way of proffer, the State advised the court of defendant's lengthy history of mostly misdemeanor batteries. The State advised that on May 26, 2015, defendant was arrested for a battery; on July 7, 2015, he was arrested for a domestic battery; on July 30, 2015, he was again arrested for a battery and sentenced to a year of supervision for threatening and pushing a Thresholds staff member; on December 2, 2016, he was arrested for resisting a police officer and aggravated assault and sentenced to 11 days in the county jail; on January 2, 2017, he was arrested for battery and resisting arrest and received 30 days in the county jail; on January 23, 2017, he was arrested for a misdemeanor battery and sentenced again to 30 days with the county; on March 1, 2017, he was arrested for resisting a peace officer and received 30 days after causing a disturbance at a coffee shop; on January 24, 2018, he was arrested for battery and aggravated assault and received 45 days after he resisted a retail security guard at a store and then punched the responding officer; and on February 26, 2018, he was arrested for aggravated assault, after swinging two knives at Dollar Tree employees but that the case was dismissed. Further, while this case was pending, defendant received multiple disciplinary tickets in jail for refusing orders and fights.

¶ 78    In mitigation, the defense observed that most of these cases were misdemeanors and were evidence of defendant's housing instability and untreated mental illness. Counsel noted that defendant had not received any disciplinary tickets in the last two years, which counsel argued was a result of his being medicated. With respect to instability, counsel argued that defendant had no contact with his father after age six and that his mother struggled financially

to raise defendant and his siblings and also beat defendant. When he was 17 years old, he became a ward of the state. When he aged out of state care at age 21, he began a period of housing instability, living on the street or with friends.

¶ 79    With respect to mental health, defendant was diagnosed with attention-deficit/hyperactivity disorder at age 12 and with delusional and hallucinogenic thinking at age 17. In 2011, he was diagnosed with bipolar disorder. Defendant was a resident at both UCAN and Thresholds at various times; however, when he aged out at age 21, these services ended. Defendant began self-medicating with marijuana and alcohol. Defense counsel asked for a 10-year sentence. On his own behalf, defendant stated that he acted in self-defense and apologized to the victim's family.

¶ 80    In its sentencing remarks, the court noted the mitigation evidence, namely that defendant had little family support and mental health issues. With respect to the victim, the trial court observed that the victim was not a first responder but "an always responder," working with people who need help. On the one hand, the court noted that it had an obligation to be fair and mindful of defendant's background, which the court believed it had done with its finding at the end of trial, and, on the other hand, the court noted that it had an obligation to protect the public. The court then sentenced defendant to 18 years, with a credit of 1,862 days, or a little over 5 years.

¶ 81    Defense counsel filed a postsentencing motion, which was denied. Two days later, on April 19, 2023, defendant filed a notice of appeal, and this timely appeal followed.

¶ 82                                ANALYSIS

¶ 83                      I. Defendant's Self-Defense Claim

¶ 84        Defendant claims, first, that the State's evidence was insufficient to prove him guilty of murder, because the State failed to disprove his self-defense claim.

¶ 85        When considering a challenge to the sufficiency of the State's evidence, a reviewing court must view the evidence in the light most favorable to the State and then decide whether any rational trier of fact could have found the offense proven beyond a reasonable doubt. *People v. Jackson*, 2020 IL 124112, ¶ 64; *People v. Wright*, 2017 IL 119561, ¶ 70. Under this standard, a reviewing court does not retry the defendant; that is not the function of this court. *Jackson*, 2020 IL 124112, ¶ 64; *Wright*, 2017 IL 119561, ¶ 70. Rather, as a reviewing court, we owe deference to the factfinder's determinations regarding the credibility of the witnesses, the weight to be accorded their testimony, the resolution of any conflicts in the testimony, and the reasonable inferences that may and should be drawn from the evidence. *Jackson*, 2020 IL 124112, ¶ 64; *Wright*, 2017 IL 119561, ¶ 70.

¶ 86        Our mandate to consider all the evidence does not require a written " 'point-by-point discussion of every piece of evidence,' " with " 'every possible inference that could be drawn therefrom.' " *Jackson*, 2020 IL 124112, ¶ 71 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007)). Such a dissertation " 'would effectively amount to a retrial on appeal.' " *Jackson*, 2020 IL 124112, ¶ 71 (quoting *Wheeler*, 226 Ill. 2d at 117).

¶ 87        Defendant was convicted of second degree murder. To find a person guilty of second degree murder, a factfinder must find, first, that the defendant committed first degree murder and, second, that one of two mitigating factors is present. *People v. McDonald*, 2016 IL 118882, ¶ 59. The first possible mitigating factor is an unreasonable belief in the need for self-defense, and the second is that, at the time of the murder, the defendant was acting under a sudden and intense passion resulting from a serious provocation. *McDonald*, 2016 IL 118882,

¶ 59. In the case at bar, defendant was found guilty of second degree murder under the first factor.

¶ 88      The first finding required, however, is that the defendant is guilty of first degree murder. When a defendant raises the affirmative defense of self-defense, as happened in this case, the State then has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *People v. Washington*, 2012 IL 110283, ¶ 34. Defendant argues on appeal that the State failed to disprove any of the elements of self-defense and, thus, failed to sustain its burden of proving him guilty of first degree murder.

¶ 89      "[T]o obtain a jury instruction on self-defense, a defendant must establish some evidence of six factors: (1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable." *Washington*, 2012 IL 110283, ¶ 35. "[A] defendant's belief [is] not necessarily an element that the State [is] required to disprove in defeating a claim of self-defense. Rather, the question of the reasonableness of a defendant's belief is merely one of six factors that the State could choose to rebut." *Washington*, 2012 IL 110283, ¶ 35; *People v. Jeffries*, 164 Ill. 2d 104, 128 (1995) (the unreasonableness of defendant's belief "is only one of the six enumerated factors which the State may choose to attack to rebut a claim of self-defense"). "If the State negates any one of the self-defense elements, the defendant's claim of self-defense must fail." (Emphasis omitted.) *Jeffries*, 164 Ill. 2d at 128.

¶ 90      On appeal, the State chooses to argue five of the six factors. The only factor it does not argue on appeal is factor (5): that defendant lacked an actual and subjective belief that a danger

existed that required the use of the force applied. On appeal, defendant asserts that the State failed to disprove every factor but argues primarily factor (2), that defendant was not the initial aggressor, and factor (6), that defendant's belief in the amount of force needed was objectively reasonable. Defendant claims that his use of force was proportionate and reasonable, at every step of the way.

¶ 91    Defendant argues that the victim was the initial aggressor because the victim pepper sprayed defendant. However, for self-defense to be justified, the danger of harm must be imminent. In the case at bar, the indisputable evidence is that defendant fought his way into the apartment building. If defendant had backed off, there would have been no further harm.

¶ 92    Instead, defendant forced his way into the vestibule by the victim's apartment, and a fight ensued. Defendant argues that he dropped his knife, that the victim picked it up, and that the victim was the first to use the knife. However, the support for that order of events comes only from defendant's testimony, and the factfinder was under no obligation to believe him. The undisputed evidence is that it was defendant's knife. The factfinder was allowed to consider why defendant came to the victim's home, armed with a knife in the first place.

¶ 93    The evidence established that, while angry, upset, and armed with a knife, defendant arrived at the victim's home and started repeatedly hammering his fist into the door, at the same time that defendant mumbled incoherently, yelled, and swore (as the neighbors related) and threatened the victim (as the victim related). While Officer Wilson did not recall whether she used a knife to open the door or whether she simply kicked it open, she testified that she was able to open that same door fairly quickly and easily, without a code or key. After his arrest, defendant asserted in an interview that he had "just" decided that the victim "needed to die" because he was a "rapist" and he was "heinous." As the pathologist's report demonstrates,

defendant carried out that decision by means of multiple stab wounds and a slashing of the victim's neck, using the knife that he had brought. In contrast to the victim's severe, multiple, and fatal wounds, defendant's injuries were such that he refused medical attention. Based on these facts and events, we cannot conclude that the factfinder was irrational for finding both factor (2), that defendant was the aggressor, and factor (6), that defendant's belief in the amount of force needed for defense was not objectively reasonable.

¶ 94    In addition, besides defendant's self-serving testimony, there is no evidence in the record regarding when the knife was first displayed. Defendant testified that he pulled out the knife in an attempt to get through the door, after he was pepper sprayed. However, defendant could have pulled out the knife from his pocket when the victim displayed the can. The court found: "I am not exactly clear as to the sequence as to whether the knife came first, or the spray of pepper came first. That is not entirely clear to me. It seemed to happen very close in time to each other ***." Later, the court stated: "Pepper spray was involved maybe before, unclear exactly how much before or maybe almost simultaneously the pepper spray was involved."

¶ 95    In addition to the self-serving nature of defendant's testimony, further doubt is cast on it by the parties' stipulation regarding S.B. In light of the stipulation that S.B. did not have a dating relationship with the victim and was never raped by him, it is highly doubtful that the victim said anything about an alleged rape in the midst of the fight, as defendant testified to. This telling detail casts more doubt on the veracity of defendant's testimony, in addition to its self-serving nature.

¶ 96    In its briefs and at oral argument, the defense stressed that the victim was bigger than defendant—but overlooked the fact that the victim was also more than twice as old. The victim was 27 years older than defendant.

¶ 97    For all these reasons, we cannot find that no rational factfinder would take the view that the trial court did, and we affirm its finding that this was not self-defense.

¶ 98                                  II. Closing Argument

¶ 99    In his appellate brief, defendant argues that, "[f]or many of the same reasons the State failed to disprove [defendant's] self-defense claim," the State also mischaracterized the evidence and law during closing argument. Defendant argues:

"(1) the State erroneously argued that [defendant] was the initial aggressor just for showing up at the apartment building; (2) the State erroneously argued that [defendant] was *per se* the initial aggressor because he possessed a knife when he arrived, and (3) the State erroneously argued that [defendant's] belief in the need to defend himself was unreasonable because his belief that [the victim] raped a woman named [S.B.] was unreasonable."

¶ 100   Due to the fact that this was a bench trial and for the same reasons that we affirmed the trial court's finding that this was not self-defense, we find that the State's arguments, which defendant pulls out of context, yielded no unfair prejudice to defendant.

¶ 101                                A. Plain Error Doctrine

¶ 102   Defendant acknowledges that he failed to object to two of the three alleged mischaracterizations at trial and, therefore, failed to preserve these two arguments for appellate review. *Jackson*, 2020 IL 124112, ¶ 81. To preserve an issue for appellate review, a defendant must object both at trial and in a posttrial motion. *Jackson*, 2020 IL 124112, ¶ 81. Admitting his procedural default, defendant seeks review through the plain error doctrine. "This doctrine serves as a narrow and limited exception to the general rule of procedural default." *Jackson*, 2020 IL 124112, ¶ 81. A reviewing court will consider unpreserved error only when a clear or

obvious error occurred and one of two prongs is met. *Jackson*, 2020 IL 124112, ¶ 81. In the case at bar, defendant argues only the first prong: that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *Jackson*, 2020 IL 124112, ¶ 81.

¶ 103     However, our supreme court has held that "[t]he standard of review applied to a prosecutor's closing argument is similar to the standard used in deciding whether a prosecutor committed plain error." *Jackson*, 2020 IL 124112, ¶ 83. Thus, our analysis with respect to all three comments is substantially the same, although two were not preserved. With respect to all three comments, we may "find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83.

¶ 104                         B. Standard of Review

¶ 105     Both defendant and the State agree that there is a split among the appellate court districts regarding the standard of review for a trial court's ruling on a prosecutor's alleged misstatement in closing, with some districts applying a *de novo* standard and others reviewing only for an abuse of discretion. See *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 127 (collecting cases by district); *People v. Boston*, 2018 IL App (1st) 140369, ¶ 82; *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39 (noting the "confusion regarding the appropriate standard of review regarding alleged errors occurring during closing arguments that originates from our supreme court's apparent conflicting holdings"). The question of the deference owed to a trial court's ruling—whether *de novo* or abuse-of-discretion review—arises only with respect to preserved error, where a defendant made an objection that caused the trial court to make a ruling.

¶ 106    The parties are correct about the split in the appellate court, and it dates back to dueling remarks made by our supreme court in different cases. Compare *Wheeler*, 226 Ill. 2d at 121 ("Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo.*"), with *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (" '[T]he trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion.' [Citations.]"). More recently, in 2022, our supreme court cited *Blue* and stated: "A trial court's decision to overrule an objection to a comment in prosecutorial closing argument will not be overturned absent an abuse of discretion." *People v. Williams*, 2022 IL 126918, ¶ 41 (citing *Blue*, 189 Ill. 2d at 128). However, this is not an issue that we need resolve with respect to the one ruling made in response to the one preserved remark, because our holding would be the same under either standard.

¶ 107    The parties agree, as they must, that the State has wide latitude in the content of its closing argument. While commenting on the evidence, a prosecutor may draw any reasonable inferences that the evidence may support. On appeal, we consider the State's closing arguments as a whole, rather than pulling out isolated words or remarks. *Jackson*, 2020 IL 124112, ¶ 82.

¶ 108                                   C. Bench Trial

¶ 109    "Notably, this case was tried before the bench." *People v. Yancy*, 368 Ill. App. 3d 381, 386 (2005). Unlike when the jury is the factfinder, the trial judge in a bench trial is presumed to know the law and to follow it. *Yancy*, 368 Ill. App. 3d at 386. This presumption, that the judge as factfinder knew and followed the law, can be rebutted only when the trial record affirmatively proves otherwise. *Yancy*, 368 Ill. App. 3d at 386.

¶ 110 Defendant argues on appeal that the presumption is overcome in this case, because the State's remarks caused the judge to misapply the law regarding self-defense. However, this is just another way of saying that the trial court erred in rejecting defendant's self-defense claim, and for the reasons that we already explained in the prior section, we did not find this argument persuasive.

¶ 111 III. Excited Utterance

¶ 112 Defendant claims that the trial court erred in admitting the audio tape of the victim's 911 call, because of the alleged lack of a startling event. For the following reasons, we do not find this claim persuasive.

¶ 113 According to the Illinois Rules of Evidence, hearsay is defined as a statement other than one made by the declarant while testifying at trial, which is offered in evidence to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). The rule against hearsay prohibits the admission of hearsay, unless the specific statement under consideration is covered by an exception in a statute or rule. Ill. R. Evid. 802 (eff. Jan. 1, 2011).

¶ 114 Relevant to this appeal, Illinois Rule of Evidence 803(2) (eff. Mar. 24, 2022) contains just such an exception and permits the admission of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." For a hearsay statement to be admissible under this exception, (1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must be an absence of time for the declarant to fabricate the statement, and (3) the statement must relate to the circumstances of the occurrence. *People v. Williams*, 193 Ill. 2d 306, 352 (2000); *People v. Morales*, 2021 IL App (2d) 190408, ¶ 12.

¶ 115        On appeal, defendant challenges only the first factor. He does not argue either the second factor, that the time lapse was too long, or the third factor, that the statement was unrelated to the offense. Our supreme court has found that "the fact that a declarant's statement is made at the first opportunity to speak supports a finding" of the first factor. *Williams*, 193 Ill. 2d at 352-53. "That a statement is volunteered has also been found to support a finding of admissibility ***." *Williams*, 193 Ill. 2d at 353. "[T]he fact that a statement was made in response to a question does not necessarily destroy spontaneity ***." *Williams*, 193 Ill. 2d at 353. Statements of " 'worry' " that demonstrate "fear and anxiety" may be admissible under this exception. See *Williams*, 193 Ill. 2d at 355.

¶ 116        Regarding the proper standard of review for this issue, defendant cited for our consideration *Morales*, 2021 IL App (2d) 190408, ¶ 13. We agree with defendant that the *Morales* case is on point. In *Morales*, as in the case at bar, the defendant challenged the admissibility of a recorded statement by the victim to a 911 operator on the ground that the statement did not satisfy the first factor. *Morales*, 2021 IL App (2d) 190408, ¶ 14. In *Morales*, the reviewing court found that the trial court's ruling regarding whether the recorded 911 statement was, or was not, an excited utterance was within the sound discretion of the trial court. See *Morales*, 2021 IL App (2d) 190408, ¶ 13. As a result, the appellate court stated that the trial court's ruling could not be reversed unless the trial court had abused that discretion. Further, such abuse occurs only if the trial court's ruling was arbitrary, fanciful, or unreasonable or if no reasonable person could have taken the view adopted by the trial court. *Morales*, 2021 IL App (2d) 190408, ¶ 13; see also *Williams*, 193 Ill. 2d at 349 (with respect to admission of statements, "we may affirm the circuit court's decision for any appropriate

reason, regardless of whether the circuit court relied on those grounds and regardless of whether the circuit court's reasoning was correct").

¶ 117    In *Morales*, the reviewing court did not find an abuse of discretion, where the startling nature of the event predominated the call, where the recording showed that the victim was breathing heavily and was distressed, where the victim's call was immediate and asking for help, where the operator was the first person the victim spoke with, and where the operator's questions were an attempt to determine the nature of the situation rather than a persistent interrogation. *Morales*, 2021 IL App (2d) 190408, ¶ 18.

¶ 118    Similarly, in the case at bar, the startling nature of defendant's threats and incessant attempts to enter predominated the call, with the victim stating repeatedly that he was being threatened. The recording showed that the victim here was breathing heavily and distressed, stuttering when asked if defendant was armed, and begging for help. The victim's call was immediate, occurring while defendant was attempting to enter. Finally, the operator was the first person the victim spoke with, and her questions, as the operator herself explained, were an attempt to determine the nature of the situation, rather than a persistent interrogation.

¶ 119    In *Morales*, the victim's neck had already been injured when the victim made the call, whereas in the case at bar, the victim's neck had not yet been slashed. *Morales*, 2021 IL App (2d) 190408, ¶ 3. However, we know of no rule that requires the injury to come before the statement in order for a statement to be admitted. Thus, we do not find persuasive defendant's claim that the 911 call did not qualify as an excited utterance.

¶ 120                                    IV. Sentencing

¶ 121    Defendant argues that the trial court erred at sentencing by allegedly considering the victim's status in the community as a factor in aggravation at sentencing. The sentencing range

for second degree murder is 4 to 20 years. Defendant received a sentence of 18 years, which was within the permissible sentencing range but at the high end.

¶ 122    Defendant acknowledges on appeal that this issue was forfeited for our review. In his appellate briefs, defendant argued both first and second prongs of the plain error doctrine. However, defendant subsequently filed a motion on appeal seeking to withdraw his claim of second prong error, which this court granted. We already set forth the plain error doctrine in a prior section, so we will not repeat it here.

¶ 123    It is well settled that a trial court has broad discretion in selecting the appropriate sentence within the sentencing range. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A trial court's sentencing decision is entitled to great deference, because the trial court is in a far better position than the reviewing court to weigh factors such as the defendant's credibility, demeanor, moral character, age, and social influences. *Stacey*, 193 Ill. 2d at 209. As a result, a reviewing court must be careful not to substitute its judgment for that of the trial court simply because, based on a cold transcript, the reviewing court is tempted to weigh the factors differently. *Stacey*, 193 Ill. 2d at 209.

¶ 124    Decisions of our supreme court "have established that, absent an abuse of discretion by the trial court," a sentence within statutory limits "may not be altered on review." *Stacey*, 193 Ill. 2d at 209-10. Although a trial court's discretion is wide and our deference to it well established, the trial court's discretion and our deference to it is not without limits. *Stacey*, 193 Ill. 2d at 209. "[A] sentence within statutory limits will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 125    In the case at bar, defendant argues that the evidence relevant to sentencing was closely balanced due to the mitigation evidence he presented and that the trial court's alleged reliance on the victim's status in the community was error as a matter of law. Specifically, defendant argues (1) that there was no detailed testimony about the work that the victim did at Thresholds; (2) that, even if there was sufficient evidence about the victim's work, the court erred in considering it because there was allegedly no relationship between the victim's work and the offense; and (3) that reliance on a victim's status in the community, as the court allegedly did here, is inappropriate.

¶ 126    As to defendant's first and second points, there was repeated evidence about Thresholds during the trial. First, the victim stated during the taped 911 call that he was Thresholds staff. Second, Sergeant Duong testified that he knew the victim prior to the offense because Duong filed missing case reports for the victim, in connection with Thresholds. Duong explained that Thresholds was "a group home for kids" and that the victim was one of its staff members. Duong identified a window just to the right of the front door, where the offense occurred, as part of the Thresholds office where the victim worked. Third, the parties stipulated that, if S.B. were called to testify, she would testify that on March 13, 2018, she was 21 years old, that she lived at Thresholds, that the victim helped her become independent and with daily life skills, and that the victim "never raped her." Finally, defendant himself testified that Thresholds had apartments in the building where the offense occurred, that the lower floors housed young adults over the age of 18, and that approximately 12 Thresholds staff members lived there.

¶ 127    Contrary to defendant's argument, details about the victim's work were provided by both Duong's testimony and the S.B. stipulation. Defendant's argument about the lack of a connection between the offense and the victim's work underestimates both the threatening

nature of defendant's behavior at the Thresholds door and the role of S.B.'s alleged rape in the offense.

¶ 128    Immediately before pronouncing sentence, the trial court shed light on why it picked the sentence it did, by noting its dueling "obligation[s]" to be fair both to defendant and to the public. The court stated that its verdict showed fairness to defendant but that the court also had a duty to protect the public from defendant, who could "still be a dangerous person." Defendant does not argue that the trial court erred by citing these dueling obligations, and thus, we cannot find error in the resulting sentence.

¶ 129                              CONCLUSION

¶ 130    For all the foregoing reasons, we do not find persuasive defendant's claims (1) that the trial judge, as factfinder, erroneously rejected his self-defense claim; (2) that, even if the evidence against defendant was sufficient, the State erred in closing argument by allegedly misstating the law of self-defense; (3) that the trial judge erroneously admitted the victim's 911 call under the excited utterance exception to the rule against hearsay; and (4) that the trial judge erred in considering the victim's status in the community during defendant's sentencing. Thus, we affirm defendant's conviction and sentence.

¶ 131    Affirmed.

*People v. Jones*, 2025 IL App (1st) 230771

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-05203; the Hon. James B. Linn, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Bradley D. Jarka, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Paul E. Wojcicki, and Lindsey Patton, Assistant State's Attorneys, of counsel), for the People. |