2025 IL App (1st) 230772

No. 1-23-0772

Opinion filed December 23 , 2025

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20 CR 60014 |
| LONDRE BROWN, | ) ) | The Honorable Peggy Chiampas, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion. Presiding Justice Mitchell and Justice Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Londre Brown was convicted by a jury of two counts of aggravated criminal sexual assault and one count of aggravated battery of a person 60 years of age or older. The trial court sentenced defendant to consecutive 27-year terms for the assault counts and a concurrent 10-year sentence for the aggravated battery, for a total of 54 years with the Department of Corrections (IDOC). The victim, E.M., who was born on December 11, 1928, was 91 years old at the time of the offense and died prior to trial.

¶ 2    On this direct appeal, defendant claims (1) that the trial court's admission of testimonial out-of-court statements by E.M. to a paramedic, to medical personnel, and to a police detective violated defendant's constitutional right to confrontation; (2) that the trial court erred when it found that other out-of-court statements by E.M., namely to a neighbor and to a responding police officer, were admissible both as excited utterances and statements made for the purpose of medical diagnosis; (3) that his counsel's representation was constitutionally ineffective for failing to introduce evidence promised to the jury during his opening statement; (4) that the trial court committed plain error when it denied defense counsel's request for a nonpattern jury instruction, which concerned the impact of prior inconsistent statements on the believability of the nontestifying victim; and (5) that defendant's 54-year sentence was excessive for a 58-year-old in ill health.

¶ 3    On appeal, with respect to the second issue, the State argues only that these statements were admissible as excited utterances, thereby effectively conceding that they were not statements made for medical diagnosis. With respect to the third issue, the State concedes that defense counsel did make promises in his opening statement that he did not keep; however, the State argues that this error was harmless in light of the overwhelming evidence against defendant. With respect to the fourth issue, defendant concedes that he failed to preserve this issue for appellate review and, thus, only plain-error review is available.

¶ 4    For the following reasons, we affirm.

¶ 5                                    BACKGROUND

¶ 6    At trial, Elease Dobbs testified that the victim, who was her grandmother, lived alone. The victim had lived for over 15 years in a Chicago Housing Authority (CHA) home.[1] Because

_____

    [1]CHA surveillance tapes were introduced at trial.

the offense occurred in the victim's home, Dobbs explained the layout of the residence to the jury. When you opened the victim's front door, the stairway was in front of you. The kitchen, dining room, and living room were on the first floor, and the stairway led upstairs to three bedrooms and a bathroom. On December 8, 2019, when Dobbs was visiting her grandmother, defendant knocked on the door. Dobbs told him to stop coming around to her grandmother's door trying to sell her things. Defendant said he would come back, and Dobbs replied that, if he did that, he would have her husband to deal with.

¶ 7        Dobbs visited her grandmother again on December 12, 2019, the day before the offense. Her grandmother was walking through the house, without a limp or cuts. The glass coffee table was intact, and there was no blood on the rug or on the wall. The next day, December 13, Dobbs learned that her grandmother had been taken to the hospital, and Dobbs visited her in the intensive care unit. Dobbs testified that her grandmother did not look like her grandmother and had gashes, bite marks, and bruises. Dobbs testified that the victim had an injury from her cheekbone to her ear; gashes and bite marks "out of her leg"; bruises on her back, arm, and leg; and an injury on her finger that was bleeding. The victim was crying and looked sad and "defeated," and she remained in the hospital for three days.

¶ 8        Dobbs testified that, after the victim was released from the hospital, she never went back to live in her own home in Chicago and instead went to live at Dobbs's daughter's house in a suburb. Dobbs identified photos of the victim taken while the victim was in the hospital, which were admitted into evidence with no objection. Using the photos, Dobbs pointed out an abrasion and bruise on the victim's shoulder, a large open wound below the victim's ear, an abrasion on the victim's face, scrapes on her neck, a large gash wound on the victim's arm, bruises on the arm, a gash on her inner thigh, scars on her leg, an injured finger, and scrapes and bruising on her back.

Dobbs testified that the victim did not have any of these injuries when she visited the victim on December 12 but that Dobbs observed these injuries when she visited the victim the following day, on December 13.

¶ 9       Dobbs identified photos of her grandmother's home, including a broken coffee table. Dobbs explained that the base was a ceramic elephant with a thick piece of circular glass on top. In the photo, the table is turned over and broken. Dobbs testified that the table was not broken when she visited on December 12, 2019. Dobbs also testified that the blood stain on the rug and next to the table, which was depicted in a photo, was also not present on December 12 and neither were the red marks on the walls by the stairs.

¶ 10      The State played a portion of a CHA surveillance video from December 13, 2019, and Dobbs identified her grandmother exiting her house and limping across the street with one shoe on. On cross-examination, Dobbs testified that the glass top of the coffee table was affixed to the base of the table with four suction cups. Dobbs admitted that, when she visited her grandmother on December 12, the victim wore long sleeves and leggings. However, Dobbs testified that she had joked with her grandmother and picked her grandmother up saying that Dobbs was now bigger than her and so "you can't hit me with the switch anymore." Dobbs testified that, if her grandmother had been hurt, Dobbs would not have been able to pick her up. The victim told Dobbs to put her down and then asked: "You want to eat?"

¶ 11      Bobby Cain, the victim's neighbor, testified that at 8 p.m. on December 13, 2019, he was at home with his mother, when the victim rang their doorbell and then started knocking on their window. When he opened the door to the victim, who lived across the street, he could see that she was hysterical, and he had never seen her like that. The victim kept repeating: " 'I been raped. And he still in my house. I been raped. He still in my house.' " The victim asked him to call

the police, which he did. Cain noticed that her hand was bleeding. While he was on the phone with the police, the victim kept loudly repeating that " 'If I had my motherf*** gun, I would have shot his ass." While they were waiting for the police, Cain looked across the street and observed a figure in the victim's doorway. The figure said " '[First name]. [First name], baby, where you went to? Where you went to, [first name]? Where you go?' " Cain recognized the voice as defendant's voice.

¶ 12    Cain testified that he had known defendant ever since Cain was little. Cain said that they used to play ball together and that defendant had taught Cain "how to stay out of trouble." Cain had seen defendant selling things to people in the neighborhood, and defendant had sold stuff to Cain. When the police arrived, they escorted the victim across the street, and Cain cleaned up the blood that was on his phone, floor, and table.

¶ 13    On cross-examination, Cain testified that, when the victim arrived at his door, she had one shoe on and one shoe off. Defense counsel asked if, part of the time, the victim was saying " '[h]e raped me' " and if part of the time she was saying " '[h]e tried to rape me.' " But Cain said "Naw." Counsel asked if, when Cain provided a videotaped statement to the police, Cain had said that the victim had said "tried" at some point, and Cain said "Naw." The last time that Cain had seen the victim before December 13 was the week before when he took her to the store to buy some fish. In the month before December 13, Cain had seen defendant at the victim's house, when defendant was trying to sell stuff.

¶ 14    Officer Todd Olsen, a 27-year veteran with the Chicago police force, testified that at 8:10 p.m. on December 13, 2019, he received an assignment, with his partner, Rafael Borja, to respond to a sexual assault call. When they pulled up and Officer Olsen exited their vehicle, he was approached by a frantic elderly woman with one shoe on and one shoe off and with blood

coming from the area of her left ear. The victim stated that she had been raped and the offender was in her home. Olsen then went across the street to her home with his partner and the victim. They opened the door, and Olsen yelled for anyone inside to exit. Olsen then observed defendant at the top of the stairs, and the victim yelled "That's him" and "He raped me." Olsen instructed defendant to come down and instructed the victim to stay outside for safety reasons. Olsen placed defendant in handcuffs and had defendant sit on the living-room couch. In front of the couch, Olsen observed that a coffee table was flipped over, with its porcelain pedestal damaged and pieces of it lying in the living room. In response to Olsen's call for an ambulance, paramedics arrived and took the victim to an ambulance.

¶ 15     The State played the portion of the CHA surveillance tape that depicted his arrival, his conversation with the victim, and their walking over to her home. Officer Olsen identified the people depicted on the video. On cross-examination, counsel asked if the victim told Olsen that the offender had used a firearm in the assault; Olsen answered ambiguously "Yes. That was the call that came out." Olsen did a cursory search for a firearm in the house, by himself and without his partner, but did not find one. On redirect examination, Olsen explained that, by "cursory," he meant that he did "a quick look with my eyes" but did not disturb anything. There was a room filled with storage items upstairs, and he just put his "head in there and looked."

¶ 16     On redirect examination, Olsen testified that the victim told him specifically that the offender had "stuck his penis in her mouth and vagina."[2]

---

[2]In his appellate brief, defendant argues that "Officer Olsen testified that [the victim] said [defendant] 'raped' her *** but *** did not testify that [the victim's] allegation was based on oral or vaginal penetration." However, Olsen's testimony on redirect examination indicates both oral and vaginal penetration.

¶ 17    Christopher Daly, a paramedic, testified that, on December 13, 2019, at approximately 8:30 p.m. when he arrived at the scene, he observed an elderly woman sitting at the top of the stairs, who was "stressed out" and "near hysterical." The victim did not want anyone to touch her; she was "shaking" and "very scared." Daly's partner, Anthony Hoard, coaxed her down the stairs. After the victim stepped outside, she sat in a chair they had brought, and they took her to the ambulance. Her demeanor in the ambulance was the same as it had been at the top of stairs: "anxious, nervous, seemed very scared." Daly explained that, because he was the paramedic, he assessed the patient while his partner did the documentation. While Daly was assessing her and asking, "what happened," the victim said that defendant had bitten her and had "stuck his penis in her mouth." The victim said defendant was holding her down and she was fighting him off and "that's why she was hurt all over."

¶ 18    Daly described the injuries he observed, including a very deep cut in her right thigh that seemed almost to the bone. Daly explained that doctors at the hospital would want to know how big the knife was, what kind of knife was used, and whether it was clean or dirty. For this reason, Daly went back inside the victim's house and asked defendant " 'What kind of knife did you use to cut her?' " Defendant replied: " 'I didn't use a knife. I bit her.' " Daly described defendant's demeanor as "[a]lmost smug," like he "didn't care." After speaking with defendant, Daly returned to the ambulance. Because of "her demeanor and her mental state, we didn't want to do too much." As a result, he lightly covered her wounds and transported her to the hospital. Using the photos of the victim that were previously introduced during Dobbs's testimony, Daly described the victim's injuries. Describing the large deep wound on her leg that prompted him to ask about a knife, Daly noted that you could "see the fatty tissue going all the way down" and the wound "goes down pretty deep."

¶ 19       On cross-examination, Daly explained the process by which he and his partner usually write a report. He explained that his partner generates the report with information, such as the patient's condition and vital signs, which will be relayed to the doctors. Daly then reads the report over and signs off on it. When asked if the report includes information for a police investigation, Daly replied: "If it needs to happen that way." On redirect examination, the State played the CHA surveillance video, and Daly identified himself entering the victim's residence a second time to ask about a knife.

¶ 20       Nurse Manda Baker testified that on December 13, 2019, at 10:10 p.m., she was working in a hospital trauma unit, when she encountered the victim, who had first been brought to the emergency room and then transferred to the trauma unit. Baker described the victim as "pretty hysterical, crying, very upset." Baker testified that the victim, who had injuries all over her body, reported that she had a bite mark to her right inner thigh. The victim stated that her neighbor had attacked her and bit her in multiple places and that she was vaginally penetrated with his penis. Nurse Baker was present both when the victim was examined by a sexual assault nurse examiner and when a technician from the Chicago Police Department came to take photos. The nurse then reviewed the photos that had already been described and reviewed by Dobbs and Daly.

¶ 21       On cross-examination, Baker acknowledged that her notes reflected that the victim told her that the offender put a gun in her mouth. Baker had called nurse Nicole Mattes to do the sexual assault kit in this case, and Baker acknowledged that this was for evidence collection. When Mattes came to do the kit, the victim had not yet been bandaged, and the sutures had not yet been done, but her condition was stable.

¶ 22       Nicole Mattes, the sexual assault nurse examiner, testified that she first encountered the victim in the trauma unit on December 13, 2019, at 11 p.m. The victim was "crying, basically

traumatized for what just happened to her." The victim stated that a man she knew from the neighborhood came to her door trying to sell her some socks and that, when she tried to close the door, he knocked her over with his fists and hit her. The victim stated that he bit her, raped her, and stuck a gun in her mouth. The victim stated that she was bitten on her right forearm, her left cheek, and her right inner thigh. Nurse Mattes recorded the victim's numerous injuries in the rape kit, including the bite marks on the victim's left cheek, right inner thigh, and right arm.

¶ 23    Mattes testified that she did a vaginal exam, which revealed blood in the victim's vaginal vault. Mattes explained that the vaginal vault was the "tunnel" between the vaginal opening and the cervix. Mattes explained that, in a postmenopausal woman, "blood can indicate that there's either some sort of friction or trauma." Mattes testified that blood was consistent with trauma. In addition to the blood in the victim's vagina, Mattes observed an abrasion to the victim's "posterior fourchette." Mattes explained that, if you look at the vaginal opening as a clock, the posterior fourchette is the skin at 6 o'clock. Mattes testified that the abrasion to the posterior fourchette was also consistent with trauma.

¶ 24    As part of the kit, Mattes collected swabs from the interior and exterior of the victim's vagina, her anus, and her mouth and bite marks on her right arm, her left cheek, her right thigh, and her ear. When Mattes later received the victim's clothing from the emergency room, Mattes recovered from the pocket of the victim's sweater an Illinois state identification card and a Ventra card, both bearing defendant's name. On cross-examination, counsel noted that a form in the kit asked if the victim had oral contact with the offender's penis and that Mattes had indicated that it was not applicable. Mattes agreed that this was on the form. The form also asked if the offender had oral contact with the victim's vagina, and Mattes had originally marked " 'No' " and then crossed that out and initialed it and marked it also as not applicable. The victim said that the

9

offender had stuck a gun in her mouth, and Mattes made a note that it was a .38-caliber gun. On redirect examination, Mattes testified that, where she had written "NA" by the question of whether the victim had oral contact with the offender's penis, "it was a mistake." On recross-examination, Mattes acknowledged that she had made a mistake about the oral contact question and that she had also made a mistake when she filled out the date.

¶ 25    The State introduced certified copies of the victim's birth and death certificates, which were admitted without objection and which indicated that the victim was born in 1928 and died on May 14, 2020, five months after this offense.

¶ 26    The State then called Dr. Tai Holland, who testified that, after completing medical school, he completed an orthopedic surgery residency at Rush Medical Center. As part of his residency and training, he rotated through different hospitals and different specialties. While a resident, he rotated through a trauma unit, where he encountered the victim on December 13, 2019, at 10:10 p.m. When he saw her, she had already been released from the emergency room to the trauma unit. Dr. Holland reported that the victim was alert and responding appropriately to questions, although "very distressed." The victim stated that she had been raped and that she was in pain. However, Dr. Holland found that she was "medically stable." Dr. Holland explained that, as part of a primary survey, the victim had been evaluated for cardiac issues and issues with breathing and circulation. The victim also had no head trauma. He then proceeded with a secondary survey, which assessed every injury.

¶ 27    Dr. Holland testified that he asked the victim what happened and she stated that somebody was at her door, trying to sell her socks, and when she declined, the man forced entry into her home. She was knocked on her back; he was on top; he had a gun and put it in her mouth. The offender was hitting and biting her and raped her. Dr. Holland asked what she meant by the

term " 'rape,' " and she said that he had placed his penis in her vagina and in her mouth. After the victim's wounds were thoroughly washed, he closed the deeper lacerations with sutures.

¶ 28    Dr. Holland then reviewed the injuries documented by the same set of photos that other witnesses had reviewed. With respect to a wound below the victim's ear, the doctor explained that it was "pretty deep," cutting through the skin layer into the connective tissue below it. He noted that the wound had a semicircular area that lacked "clean skin edges." The wound looked like "a component of puncture wounds throughout the edge" with "a void of tissue" in the center.

¶ 29    Dr. Holland noted that on the victim's cheek, lower down on her jaw, there was "another semicircular patterned wound that's less deep." Higher up on her cheek, there was yet another semicircular wound, which was mostly a bruise but that did break the skin at one point. On her left shoulder, there was an abrasion surrounded by bruising. Her right forearm contained yet another semicircular wound, which also appeared to be "a mixture of puncture wounds along the rim of it." Dr. Holland testified that the semicircular wounds were consistent with bite wounds and that the victim had stated that "she was bitten all over."

¶ 30    Dr. Holland stated that the victim's most significant wound in size and depth was the wound on her right thigh. Part of the wound was deep; evidence of its depth was the fact that the viewer could see the "fat globules" or "subcutaneous fat" that is "below the level of the skin dermis." Dr. Holland believed this was a bite wound and the victim had mentioned that she had bite wounds on her thigh, so "those two things together matched up for me." The doctor noted other wounds on her leg that were not as deep but appeared to be potential bite wounds based on the irregular edges. Dr. Holland noted injuries on the victim's back but that it was hard to say what had caused them. However, they were consistent with bite wounds as well. Dr. Holland identified injuries to her middle finger as shown in a photo and said there was further injury to the side of

her hand, which was not in the photo. On cross-examination, Dr. Holland stated that he examined the victim's mouth and found no signs of injury in her mouth.

¶ 31 Officer Vincent Cervenka, an evidence technician with the Chicago Police Department, testified that on December 13, 2019, he received an assignment to process a sexual assault crime scene and that he arrived just before midnight. Officer Cervenka walked through the residence, labeling certain areas as evidence and then taking photographs. Next he collected evidence, such as swabbing suspect blood stains and processing the broken coffee table for fingerprints. The officer identified the photos that he had taken and the suspected blood stains depicted in them. The officer also went with Detective Combs to the hospital and photographed the victim's injuries.

¶ 32 Detective Robert Combs testified that on December 13, 2019, he and his partner, Detective Andrew Neberieza, received an assignment regarding a sexual assault with the offender in custody. First they went to the hospital to make contact with the staff there and establish the status of the victim. Then they went to the victim's three-bedroom residence. Two of the bedrooms were being used as storage units and were filled almost in their "entirety." The remaining bedroom, which was clearly being used as a bedroom, also contained "a large amount of personal property." After meeting with the evidence technician, they went to the trauma unit of the hospital, where they met with the victim and the sexual assault nurse examiner. The victim told him something that made him return to the residence, namely that the offender had a gun. Although the detective returned to the residence, he could not find a gun, so he returned to the hospital again to meet with the victim. When he returned, the victim told him that she also had a gun. The detective returned to her residence, located her gun, secured it, and inventoried it, but he was still unable to locate the offender's gun.

¶ 33    Detective Combs testified that in the late afternoon or early evening on December 14, 2019, he and an assistant state's attorney (ASA) met with the victim. He described her condition at that time:

> "She was incredibly exhausted. I don't think that she had any opportunity to sleep from the night before between treatment and the amount of pain that she was in. She had been medicated for pain, but she was still responsive and gave clear and lucid answers[.]"

When he asked her again "about the firearm," she said, "there wasn't one," and then she fell asleep.

¶ 34    Detective Combs testified that he obtained the CHA surveillance video for the victim's residence for the time period from 7:15 to 9:05 p.m. on December 13, 2019. In a clip from 7:27 p.m. to 7:37 p.m., the video showed someone on the front porch of the victim's residence and then entering it. At 8:04 p.m., someone exits the residence and walks across the street. At 8:05 p.m., someone sticks their head out of the residence's doorway. At 8:15 p.m., a police squad arrived on the scene. At 8:30 p.m. the paramedics arrived. At 8:45 p.m., while the paramedics were still on the scene, someone walked in and out of the victim's residence. At 8:59 p.m., the video showed defendant being brought out of the residence and placed in the squad car and the squad car leaving the scene.

¶ 35    Detective Combs testified that, when he returned to the victim's home to look for weapons, there was a room he could not gain access to because it was too full of possessions. The floor was entirely covered, and the door was blocked. On December 14, 2019, he met with nurse Mattes, who had recovered a state of Illinois identification card and a Chicago Transit Authority Ventra card, both bearing defendant's name, and he inventoried them.

¶ 36    On cross-examination, defense counsel asked if, during the first time that the detective spoke with the victim on December 13, 2019, she had told him that the offender "placed the barrel of a chrome firearm in her mouth and dragged her up the stairs to her bedroom." After reviewing his report, Detective Combs acknowledged that the victim had made that statement to him at that time. Although he looked for it, he did not find a chrome firearm. When the victim indicated that she had a gun, she stated her gun was black and the offender's gun was chrome. The victim told him that her gun was in a black bag and where it was, namely on a table in the dining area. Later, the victim told him that the offender did not have a gun.

¶ 37    On redirect examination, the State asked if the victim had told the detective other things about her offender, besides having inserted a gun into her mouth. The detective acknowledged that the victim told him that the offender "stuck his d*** in my mouth and tried to choke me with it." The victim also related that "he beat me, he dragged me upstairs, and then he raped me."

¶ 38    The parties stipulated that a proper chain of custody was maintained at all times for the sexual assault kit, that a technician obtained fingerprints from defendant and those prints were transported to the Forensic Services Division of the Chicago Police Department, that a buccal swab standard was obtained from defendant for DNA analysis, and that a fingerprint examiner compared defendant's prints to a print lifted from the glass top of the table in the victim's living room and the print on the table originated with defendant's right ring finger.

¶ 39    The parties further stipulated that a forensic DNA scientist with the Illinois State Police received defendant's buccal swab and the sexual assault kit that contained, among other things, the vaginal, oral and anal swabs collected from the victim. The scientist would testify that, when semen may be present, they use "a differential extraction," which "attempts to separate out sperm cells from other cells in the sample." Two tubes of DNA result from this process, which are called

"the non-sperm fraction and the sperm fraction." The scientist would "testify that male DNA was depicted in the non-sperm fraction from the vaginal swabs; however, there was too much female DNA to be able to detect the DNA profile of any males in the sample." "No male DNA was detected in the sperm fraction from the vaginal swabs."

¶ 40 The parties stipulated that the scientist "would testify that male DNA was also detected in the non-sperm fraction from the oral swabs." However, "there was too much female DNA to be able to detect the DNA profile from any males in the sample." "No male DNA was detected in the sperm fraction from the oral swabs." "[N]o male DNA was detected in the non-sperm or sperm fractions from the anal swabs."

¶ 41 With respect to the swabs from the right thigh, left ear, and right arm, "[m]ale DNA was detected in each of the sets of swabs." However, "there was too much female DNA to detect the DNA profile from any males in the samples."

¶ 42 The parties stipulated that another DNA scientist with the Illinois State Police would testify that she tested other swabs from the victim's ear and arm and that male DNA was detected in both samples. However, there was too much female DNA to be able to detect the DNA profile from any males. The scientist also tested the swabs of suspected blood. A swab from the living room rug indicated a DNA mixture of two people. A major female DNA profile was identified, and the victim was "included as a donor." Defendant was "included as a possible donor" of the minor DNA profile. With respect to the swabs from the stairwell and from the wall by the bathroom, the victim was "included as a donor of the female DNA profile."

¶ 43 Karen Anninanti, a DNA forensic scientist with the Illinois State Police crime lab, was found by the court, without objection, to be qualified to testify as an expert in forensic DNA analysis. She testified that she performed "Y-STR DNA analysis," which is also called "Y

chromosome DNA analysis," and which focuses only on the Y chromosome that only males have. The scientist explained that this type of testing is used when there is a high amount of female DNA to a low amount of male DNA. With Y chromosome DNA analysis, she looks "at up to 23 different locations" on "the Y chromosome." In the case at bar, she was not able to identify a profile for the sperm fractions from the vaginal and oral swabs. But she was able to identify a male profile at all 23 locations, for the nonsperm fraction of the vaginal swabs. When she compared this profile to defendant's profile, he was "included," which meant that defendant "could be the donor." She testified that "this profile would be expected to occur in approximately one in 2800 unrelated white males, one in 1500 unrelated black males or one in 2000 unrelated Hispanic males based on a 95 percent confidence limit."

¶ 44      The scientist testified that, for the nonsperm fraction from the oral swabs, she was able to identify a male profile at 19 locations. When she compared this partial profile to defendant's profile, he was "included." She testified that the frequency was the same as for the prior profile, namely, approximately 1 in 2,800 unrelated White males, 1 in 1,500 unrelated Black males, or 1 in 2,000 unrelated Hispanic males.

¶ 45      With respect to the swabs from the victim's thigh, she was able to identify a male profile at all 23 locations, and defendant was included, meaning that it was "possibl[e]" that he could be the donor. The frequency was the same as for the two prior profiles. With respect to two swabs from the victim's ear, she again was able to identify a male profile at all 23 locations, and defendant was included, with the same expected frequency as above for White and Hispanic males, but for 1 in 1,400 unrelated Black males. With respect to the first arm swab, she located a profile at all locations, but with the second swab, she identified a male profile at only 17 locations.

Defendant was included with both but with a different frequency, namely 1 in 1,100 unrelated Black males for the first swab and 1 in 670 unrelated Black males for the second swab.

¶ 46     On cross-examination, the scientist acknowledged that very distantly related males may have the same Y chromosome DNA.

¶ 47     The State rested, and defendant exercised his right not to testify. After listening to closing arguments and jury instructions and deliberating, the jury acquitted defendant of home invasion but found him guilty of two counts of aggravated criminal sexual assault and one count of aggravated battery to a person 60 years or older.

¶ 48                              ANALYSIS

¶ 49                          I. Order of Issues

¶ 50     Although the parties on appeal briefed the confrontation clause issue (see U.S. Const., amend. VI) first in their briefs to us, we do not address it first. We address the issues in a different order because our supreme court has emphasized, time and time again, that constitutional issues should be addressed last and that cases should be resolved on nonconstitutional grounds, if possible. See *People v. Melchor*, 226 Ill. 2d 24, 34-35 (2007) (vacated appellate court opinion and remanded with instructions to consider the hearsay exception first before proceeding to the sixth amendment issue); *In re E.H.*, 224 Ill. 2d 172, 178 (2006) ("We have repeatedly stated that cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort.").

¶ 51     On appeal, defendant challenges some of the victim's statements on confrontation clause grounds and some on the ground of not qualifying under a hearsay exception. However, he does not challenge any one statement on both grounds. The statements that he challenges solely on confrontation clause grounds were those made to a paramedic and to medical personnel. The

statements that he challenges solely on hearsay grounds were made to the victim's neighbor, Bobby Cain, and to the responding officer, Officer Todd Olsen.

¶ 52       Striving to avoid constitutional issues where possible, we address defendant's appellate issues in the following order: (1) the admission of statements to the paramedic and medical personnel under the excited utterance exception to the hearsay rule, (2) the trial court's allegedly plain error in denying a nonpattern jury instruction, (3) the allegedly constitutionally defective assistance of trial counsel, (4) the alleged confrontation clause violations, and (5) the allegedly excessive sentence of the 58-year-old defendant. Obviously, we address the sentencing issue after the trial issues, as there would be no need to address defendant's sentencing if a trial issue required reversal.

¶ 53                     II. The Excited Utterance Exception to the Hearsay Rule

¶ 54       Defendant argues that the admission of certain statements violated the rule against hearsay. "The rule against hearsay generally prevents the introduction at trial of out-of-court statements offered to prove the truth of the matter asserted." *People v. Spicer*, 379 Ill. App. 3d 441, 449 (2007); Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). However, the rule has so many exceptions that it sometimes seems more hole than cheese. See *Spicer*, 379 Ill. App. 3d at 449 ("[T]he rule has many exceptions."). One of those exceptions is the excited utterance exception at issue here. Ill. R. Evid. 803(2) (eff. Jan. 25, 2023).

¶ 55       The State, as the proponent of the evidence, bore the burden at trial of proving the necessary elements for admissibility. *People v. Torres*, 2012 IL 111302, ¶ 53. On appeal, a deferential standard of review usually applies when a trial court has decided whether a statement meets the requirement of a hearsay exception. See *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 53 (citing *Spicer*, 379 Ill. App. 3d at 449). In the limited and unusual situation where a trial court

misinterpreted what the language of the exception required, this court may apply *de novo* review. See *Perkins*, 2018 IL App (1st) 133981, ¶ 53. However, that is not the argument being made here. "Rather, defendant argues that, pursuant to the specific facts of this case, the trial court improperly found the statements fell within the statutory hearsay exceptions." *Perkins*, 2018 IL App (1st) 133981, ¶ 53. In such a case, "we will reverse the trial court's hearsay ruling only for an abuse of discretion." *Perkins*, 2018 IL App (1st) 133981, ¶ 53. An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person could take the view adopted by the trial court. *People v. Jones*, 2025 IL App (1st) 230771, ¶ 116; *Perkins*, 2018 IL App (1st) 133981, ¶ 53.

¶ 56        In the case at bar, the trial court admitted out-of-court statements by the victim to a neighbor and to a responding police officer as both (1) excited utterances and (2) statements made for the purpose of medical diagnosis. However, on appeal, the State does not make any arguments under the latter exception, so we turn our attention to the former.

¶ 57        The "Excited Utterance" exception permits the introduction of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). For a hearsay statement to be admissible under this exception, our supreme court has set forth three "must" requirements: (1) "there *must* be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement," (2) "there *must* be an absence of time for the declarant to fabricate the statement," and (3) "the statement *must* relate to the circumstances of the occurrence." (Emphases added.) *People v. Sutton*, 233 Ill. 2d 89, 107 (2009); *People v. Williams*, 193 Ill. 2d 306, 352 (2000); *Jones*, 2025 IL App (1st) 230771, ¶ 114; *People v. Morales*, 2021 IL App (2d) 190408, ¶ 12.

¶ 58 To determine whether these three requirements have been met, courts look at the totality of the circumstances, "including time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest." *Sutton*, 233 Ill. 2d at 107. With respect to the absence-of-time requirement noted above, our supreme court has stated that "[t]he period of time that may pass without affecting the admissibility of a statement varies greatly." *Sutton*, 233 Ill. 2d at 107. The key question to ask with respect to time is whether the statement was made while the excitement of the event still predominated. *Sutton*, 233 Ill. 2d at 107-08. In *Sutton*, for example, the defendant argued that several minutes had passed before the police arrived, thereby giving the victim an opportunity to fabricate. *Sutton*, 233 Ill. 2d at 108. Rejecting this argument, the supreme court noted that the victim was staggering, bleeding from the head, and banging on doors looking for help. Under these circumstances, the court found "it inconceivable that [the victim] would have spent the minutes before the officers arrived attempting to fabricate a statement about the event." *Sutton*, 233 Ill. 2d at 108.

¶ 59 On appeal, defendant has identified the following statements that he claims were not excited utterances. First, Bobby Cain, the victim's neighbor, testified that, at 8 p.m. on December 13, 2019, he was at home, where he lived with his 96-year-old mother, when the victim rang the doorbell and knocked on their window. Cain was concerned because the victim had "never" knocked on their window before. Cain testified that, when he opened the door, the victim was hysterical and bleeding and stated " 'I been raped. And he still in my house. I been raped. He still in my house.' " According to Cain, the victim kept repeating this statement. Defendant argues that this part of Cain's testimony should not have been admitted as an excited utterance.

¶ 60 Second, defendant argues that statements made by the victim to a responding police officer were also not excited utterances. Cain described the few minutes before the police's arrival,

noting that he was the one who had called them. Cain testified that, while he was on the phone with the police, the victim kept repeating: " 'If I had my motherf*** gun, I would have shot his ass." Cain testified that the victim kept trying to grab the phone and that she was loud and hysterical. According to Cain, the police arrived 15 or 20 minutes after he called.

¶ 61　　Officer Todd Olsen testified that he responded to the sexual assault call, arriving at 8:15 p.m. After exiting his vehicle, he was approached by the victim, whom he described as "frantic." The victim stated that she had been raped and that the offender was still inside her home. Officer Olsen and his partner then went across the street to her residence, opened the door, and yelled for anyone inside to exit. Officer Olsen observed defendant at the top of the stairs, and the victim, who was standing behind the officers, yelled " 'That's him' " and " 'He raped me.' " Defendant argues that these statements to Officer Olsen and to Cain were not excited utterances. As noted above, Olsen also testified later on redirect examination that the victim told him specifically that the offender "stuck his penis in her mouth and vagina."

¶ 62　　While acknowledging in his appellate brief that the victim made the contested statements to both the officer and the neighbor "shortly after the incident," defendant argues, first, that the victim had time to fabricate, because she allegedly did fabricate another statement. Defendant alleges that the victim (1) fabricated a statement to Officer Olsen and others that defendant had used a gun and (2) then allegedly admitted lying about it. However, Officer Olsen's testimony is ambiguous about whether the victim told him personally that defendant had used a gun:

　　　　"Q. Did she tell you that [defendant] used a firearm in this assault?

　　　　A. Yes. That was the call that came out."

21

Despite his "[y]es" answer, it is unclear from the above testimony whether the victim told him that the victim had a gun or that he made that assumption because "[t]hat was the call that came out." Officer Olsen testified that he did only a cursory search for a gun and did not find one.

¶ 63 Defendant alleges that the victim lied not only to Officer Olsen but also to others about the assailant's use of a gun. With respect to the alleged gun, nurse Baker testified that she first encountered the victim a couple of hours later, at 10:10 p.m. in the trauma ward, and that her notes reflect that the victim stated that the assailant had put a gun in her mouth. Nurse Mattes, the sexual assault nurse, testified that she first encountered the victim at 11 p.m. and that the victim told her that the assailant had put a gun in her mouth. Dr. Holland, who was also part of the trauma team with Nurse Baker, testified that he also first encountered the victim at 10:10 p.m. and that the victim stated that the assailant had put a gun in her mouth. However, these statements, which were made hours after the event, where there was time for reflection and possible fabrication, do not bear on the admissibility of statements that were made hours earlier and only minutes after the offense.

¶ 64 As for the victim's alleged retraction, the facts are not as clear as defendant tries to make them seem. Detective Combs testified that, late in the evening on December 13, he went to the trauma unit at Stroger Hospital, where he met with the victim, who told him that the assailant had a gun. The detective and his partner then returned to her packed home to search for a gun but did not find one. They then returned to the hospital and informed the victim that they were not able to find a gun. The victim responded that she owned a black gun, while the assailant's gun was chrome. They again returned to her home, located her black gun, and secured it but were unable to locate the assailant's chrome gun. In the early evening of December 14, the detective met again with the victim, with an ASA. The detective testified that the victim was exhausted, had not had

any opportunity to sleep in the last 24 hours, was in pain, and was receiving pain medication but was still able to give clear and lucid answers. When Detective Combs asked her about the assailant's gun, she said there was not one and then fell asleep.

¶ 65    Defendant argues that the victim's alleged fabrication about the assailant's gun shows that she had time, in general, to fabricate. However, the State argues that it is not as clear as defendant tries to make it seem that the victim stated to Officer Olsen that the assailant had a gun or that she later affirmatively admitted lying about it to Detective Combs. As we noted above, Officer Olsen's testimony is ambiguous on this point, and Detective Combs testified that the exhausted woman immediately fell asleep after saying there was not one. Unclear and hazy facts about a possible fabrication are not enough to support finding an abuse of discretion in admitting other statements.

¶ 66    Defendant also argues that the victim's mental state was "particularly fragile" and that her "mental and physical condition" weighed against admitting her statements to her neighbor and the responding officer. The whole point of the "Excited Utterance" exception is that the declarant is excited and still under the influence of the startling event and the "stress" that it caused. See Ill. R. Evid. 803(2) (eff. Jan. 25, 2023) (an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). We observe that the victim may have been 91, but she still insisted that, if she had her gun, she could have shot her assailant's "ass" off. Given these facts and the explicit requirements of the exception, we cannot find that her mental and physical state is cause for finding an abuse of discretion here.

¶ 67    Defendant argues that the victim also had a motive to embellish her version of events to ensure prosecution of defendant, who had injured her that night. However, this argument could

23

be made against almost every injured victim. Having carefully considered each of defendant's arguments, we do not find them persuasive.

¶ 68    Further, we note that defendant does not dispute two of the three "must have" requirements for admission, namely, a startling event and a relationship between the remark and the event. *Sutton*, 233 Ill. 2d at 107. As for the time requirement, the victim spoke to her neighbor almost immediately after the event, and she was bleeding, ringing his door and knocking on his window, similar to the victim in *Sutton*. Rejecting a similar time lapse argument, the supreme court in *Sutton* noted that the victim in that case was staggering, bleeding, and banging on doors looking for help. Under these circumstances, the supreme court found "it inconceivable that [the victim] would have spent the minutes before the officers arrived attempting to fabricate a statement about the event." *Sutton*, 233 Ill. 2d at 108. In the case at bar, the responding officer arrived just 15 minutes later, when the victim was still "frantic" and, thus, still under the stress of the event, as the rule requires. See Ill. R. Evid. 803(2) (eff. Jan. 25, 2023) (the declarant must be "under the stress of excitement caused by the event"). Like the court in *Sutton*, we find an abuse of discretion "inconceivable" on similar facts. See *Sutton*, 233 Ill. 2d at 108. For all the above reasons, we do not find defendant's arguments persuasive, and we cannot find an abuse of discretion by the trial court in admitting the victim's statements to her neighbor and the responding officer.

¶ 69                    III. Denial of a Nonpattern Jury Instruction

¶ 70                        A. Plain Error Doctrine

¶ 71    Defendant alleges that the trial court committed plain error by denying his request for a nonpattern jury instruction. To preserve an issue for appellate review, a defendant must object both at trial and in a posttrial motion. *People v. Jackson*, 2020 IL 124112, ¶ 81. A defendant's failure to do one or both results in forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48. On appeal,

defendant admits that, although his trial counsel submitted a proposed nonpattern jury instruction to the trial court, his counsel failed to preserve the issue by including it in a posttrial motion. Conceding his procedural default, defendant seeks review on appeal through the plain error doctrine. "The doctrine serves as a narrow and limited exception to the general rule of procedural default." *Jackson*, 2020 IL 124112, ¶ 81.

¶ 72       The plain error doctrine permits a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant alleges error under both prongs and also alleges that counsel's failure to preserve the issue is grounds for finding him ineffective.[3] As for the plain error doctrine, the first step under either prong is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49. In a plain error analysis, it is the defendant who bears the burden of persuasion. *Sebby*, 2017 IL 119445, ¶ 51.

¶ 73                     B. Standard of Review: Abuse of Discretion

¶ 74       As defendant acknowledges, on this issue, he has the burden of showing not only plain error but also that the alleged error constituted an abuse of discretion. See *People v. Avdic*, 2023 IL App (1st) 210848, ¶ 34.

¶ 75       "The function of jury instructions is to provide the jury with accurate legal principles to apply to the evidence so it can reach a correct conclusion." *People v. Pierce*, 226 Ill. 2d 470,

---

[3]Since we do not find error, we have no need to discuss it in the next section, which discusses counsel's alleged ineffectiveness.

475 (2007); *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). "Although the giving of jury instructions is generally reviewed for an abuse of discretion, when the question is whether the jury instructions accurately conveyed to the jury the law applicable to the case, our review is *de novo*." *Pierce*, 226 Ill. 2d at 475; see *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 76    In the case at bar, defendant acknowledges that, in this case, our review is only for an abuse of discretion. Defendant argues that the trial court abused its discretion by denying his proposed nonpattern instruction because his proposed instruction accurately explained the law and the pattern instruction given instead by the trial court did not make the same point. As already noted above, we may find an abuse of discretion only if the trial court's ruling was arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *Jones*, 2025 IL App (1st) 230771, ¶ 116; *Perkins*, 2018 IL App (1st) 133981, ¶ 53.

¶ 77                    C. The Nonpattern Instruction at Issue

¶ 78    The trial court read into the record the nonpattern instruction requested by the defense:

> "[T]he believability of a witness or a non-testifying hearsay declarant may be challenged by evidence that on some former occasion he or she made a statement or acted in a manner that was not consistent with his or her testimony or hearsay declarations in this case. Evidence of this kind may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness or non-testifying declarant in the courtroom. It is for you to determine whether the witness made the earlier statement and, if so, what weight should be given to that statement[.] [I]n determining the weight to be given to an earlier statement, you should consider all the circumstances under which it was made."

¶ 79    At the jury instruction conference, the State argued in response that (1) there was no evidence that the victim "acted in a manner that was not consistent" with her statements and (2) that the State's proposed instruction No. 14 indicated that the believability of a witness may be challenged by evidence that, on some former occasion, he or she made a statement that was not consistent with his or her testimony in this case.

¶ 80    The State's proposed instruction No. 14 was Illinois Pattern Jury Instructions, Criminal, No. 3.11 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.11), titled "Prior Inconsistent Statements." When reading this instruction to the jury, the trial court stated as follows:

> "The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.
>
> It is for you to determine whether the witness made the earlier statement, and, if so. what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made."

¶ 81    On appeal, the State also notes that the trial court read IPI Criminal No. 1.02, "Jury Is Sole Judge Of The Believability Of Witnesses." When reading this instruction to the jury, the trial court stated as follows:

> "Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them.

In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

¶ 82    At the instruction conference, defense counsel argued that his proposed instruction used essentially the same language from IPI Criminal No. 3.11 but that it added that the jury could "consider the inconsistency with a non-testifying hearsay statement." Defense counsel is correct that his proposed instruction and the given pattern instruction are virtually identical, except for the insertion of the phrases (1) "or a non-testifying hearsay declarant" and (2) "or hearsay declarations in this case."[4]

¶ 83    The trial court observed that the law was "very clear" that pattern instructions are to be favored in submitting instructions to the jury, that the State had submitted IPI Criminal No. 3.11, and that the defense had not objected to it. The court then ruled that the State's submitted pattern instruction was "directly on point and addresses the argument made by the defense counsel in this matter," and for this reason, the trial court denied defendant's proposed nonpattern instruction.

¶ 84    The trial court is correct that pattern instructions are favored, and defendant does not, and cannot, dispute this point. Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) provides that the pattern instructions "shall be used" when the trial court determines that the jury should be instructed on a subject, so long as the instruction is a correct statement of the law. See *People v. Pollock*, 202 Ill. 2d 189, 212 (2002) ("As a general rule, where an appropriate IPI instruction exists on a subject upon which the trial court has determined the jury should be instructed, the IPI must

---

[4]Defendant's proposed jury instruction also used "his or her," whereas the trial court used solely "his," but defendant does not raise this point on appeal.

be used."). A trial court may use a nonpattern instruction only if (1) there is no pattern instruction on the subject and (2) the court has determined that it is a subject on which "the jury should be instructed." Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). When a nonpattern instruction is used, it "should be simple, brief, impartial, and free from argument." Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013); see *Pollock*, 202 Ill. 2d at 211-12 (a tendered nonpattern instruction must be "accurate, simple, brief, impartial, and nonargumentative"). Further, we may affirm on any ground supported by the record. *People v. Brown*, 2023 IL App (3d) 210460, ¶ 71.

¶ 85    For starters, the defense's proposed instruction was not "simple." See Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). The instruction assumes that the average juror would understand what is meant by "a non-testifying hearsay declarant." Second, as the State argued at the instruction conference and as we already discussed in the section above, it is far from clear that an inconsistent statement by the now deceased victim was established, thereby reducing any call for such an instruction. Lastly, defendant argues on appeal that the trial court did find a need for the subject matter of his proposed instruction, although the trial court decided that the topic was already covered by another instruction. However, the trial court did not state that it found a need for such an instruction regarding a "non-testifying hearsay declarant," *i.e.*, the victim. For all these reasons, we can find no abuse of discretion by the trial court. Without an abuse of discretion, there is no cause for us to consider either the plain error doctrine or any alleged ineffectiveness of counsel on this ground.

¶ 86                              IV. Trial Counsel's Assistance

¶ 87    Defendant alleges that his trial counsel was ineffective. To determine whether defendant was denied his right to effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d

504, 526-27 (1984) (adopting *Strickland*). Under *Strickland*, a defendant must prove both (1) that his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness and (2) that, absent these errors, there was a reasonable probability that the outcome of the proceeding would have been different. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 71.

¶ 88     Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness, as measured against prevailing professional norms. *Carlisle*, 2015 IL App (1st) 131144, ¶ 72; see *People v. English*, 2013 IL 112890, ¶ 34 (counsel's assessment of the merits of an issue "depends on the state of the law at the time" of the assessment). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. (Internal quotation marks omitted.) *Carlisle*, 2015 IL App (1st) 131144, ¶ 72. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 89     To prevail, a defendant must satisfy both prongs of the *Strickland* test. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73. Thus, if one of the two prongs is missing, we need not consider the other one. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73. In addition, our analysis does not have to proceed in any particular order. *In re D.F.*, 2025 IL App (1st) 240914, ¶ 106.

¶ 90     While we are not required to proceed in a particular order, we consider first the alleged deficiency of counsel. When considering whether counsel's performance was deficient, a reviewing court keeps in mind "the wide range of reasonable professional assistance." (Internal

quotation marks omitted.) *People v. Patterson*, 217 Ill. 2d 407, 441 (2005). "Generally, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing." *Patterson*, 217 Ill. 2d at 441.

¶ 91    Defendant argues that his trial counsel rendered ineffective assistance when his counsel promised evidence to the jury in his opening statement that did not materialize during trial. Defendant claims that counsel promised (1) certain testimony by Cain and (2) testimony showing that the victim made statements establishing that she did not recall what had happened.

¶ 92    First, defendant is correct that defense counsel promised certain testimony by Cain that Cain did not testify to, as the following quotes show. During the defense's opening statement to the jury, defense counsel promised:

> "You will hear from Mr. Cain. You will hear that Mr. Cain initially tells the police 'He tried to rape me'; 'He tried to rape me,' were the words that Mr. Cain used when he was interviewed by detectives. Later he says, Well maybe she said, 'He raped me. He raped me.' But she's not specific."[5]

However, during cross-examination, that is not what Cain testified to:

> "Q. Now, she kind of kept repeating things over and over and over again, right?
>
> A. Yep.
>
> Q. And part of the time she said, 'He raped me. He raped me. He raped me,' right?
>
> A. Yep.
>
> Q. And part of the time she said, 'He tried to rape me. He tried to rape me,' correct?
>
> A. Naw. ***."

---

[5]The quote marks and capitalization are given exactly as they appear in the transcript of the trial.

Following up, defense counsel asked Cain if Cain later went to the police station and provided a videotaped statement, and Cain acknowledged that he had. Defense counsel asked: "At any time while you were speaking with those officers, did you characterize the statement that [the victim] made as 'He tried to rape me. He tried to rape me'?" To which, Cain again replied: "Naw." Thus, the above quotes from the transcript establish (1) that defense counsel promised certain testimony during his opening statement and (2) that the witness did not testify as defense counsel had promised.

¶ 93       On appeal, defendant argues that his counsel should have perfected his impeachment of Cain by introducing Cain's videotaped statement. However, instead of impeaching Cain, defense counsel made the strategic decision to rely on Cain's testimony during his closing argument to the jury. During his closing, defense counsel chose to rely on Cain's positive testimony about defendant. Cain had testified that he had known defendant since they were kids, that they had played ball together, and that defendant taught Cain how to stay out of trouble. Based on this testimony and testimony like it, counsel argued during closing:

> "You heard from Bobby Cain. And I would submit that Bobby Cain, he provided very clear and unbiased testimony in this case. Bobby Cain told you that he knows [defendant] from the neighborhood, they grew up together. And, certainly, Bobby Cain gave us a picture of what this was like, what [defendant] was like, what he understands from the neighborhood, what he understands from the [p]eople that are there. He has his finger on the pulse of the block. [Defendant] is always around; people see him all the time. He's there on a daily basis. Cain knows him. His mother knows him. The other neighbors know him. That's important testimony and important evidence. And I want you to consider it."

¶ 94    As we already noted above, strategic decisions by counsel are generally immune from ineffective assistance claims. *People v. Ramirez*, 2023 IL App (1st) 221227, ¶¶ 56-57. However, generally immune is not the same as always immune, and defendant cites in support *People v. Patterson*, 192 Ill. 2d 93, 121 (2000). In *Patterson*, the supreme court found that the failure to present a defense, which was already promised in an opening statement, rose to the level of ineffectiveness, where the supreme court could not understand "what" could possibly have led a reasonable attorney to make such a choice on the facts before it. See *Patterson*, 192 Ill. 2d at 121. By contrast, in the case at bar, counsel's strategy for how to best use Cain's testimony was made clear in his closing argument. Thus, we cannot find ineffective assistance on this ground.

¶ 95    Defendant also argues that counsel promised testimony showing that the victim made statements that she did not recall what happened but that counsel presented no such testimony. In support, defendant cites the portion of counsel's opening statement, where he argued: "you are going to hear at times that [the victim] made statements that she couldn't remember what happened." Defendant also cites the portion of counsel's opening statement where he argued that she stated that defendant put a gun in her mouth and later allegedly retracted it. However, the statements relating to the assailant's gun and her later alleged retraction were introduced at trial, thereby lending some support to counsel's assertion that the victim could not remember what happened. As a result, this does not serve as a ground for finding counsel ineffective.

¶ 96    Having reviewed carefully the statements cited by defendant on appeal as grounds for ineffectiveness, we cannot find that counsel's actions fell below an objective standard of reasonableness and thus do not satisfy the first prong of *Strickland*. See *Strickland*, 466 U.S. at 687-88. Finding no first prong, we need not examine the second. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73.

¶ 97                                    V. Opening the Door

¶ 98        Contrary to defendant's suggestion, we do not find that defendant's objection to Detective Combs's testimony can be considered a confrontation clause issue. Rather, defense counsel opened the door to the statements that defendant now objects to.

¶ 99        At trial, Detective Combs testified that he first encountered the victim in the trauma unit and that he interviewed her four times over the course of December 13 and 14. On direct examination, the detective stated that, during the first interview, the victim indicated that the offender had a gun, at which point he went back to her home to search for it. During the second interview, he informed her that they were not able to find it. At that point, she let him know that she had a gun. The detective returned to the home, found, and secured her gun but was unable to locate the offender's gun. During the fourth and final interview, the detective asked again about the offender's gun, and she replied there was not one and fell asleep.

¶ 100       During cross-examination, in response to repeated and specific questions by defense counsel, Detective Combs testified that the victim stated that her assailant pushed his way through her door, put a gun in her mouth, and dragged her immediately up the stairs to her bedroom.

¶ 101       On redirect examination by the State, the detective reiterated that the victim stated that the assailant put a gun in her mouth and dragged her up the stairs. The detective further testified on redirect that the victim stated that her assailant grabbed her by the throat, pushed her down, inserted his penis in her mouth, and raped her.

¶ 102       During redirect examination, defense counsel objected to the State's questions about the rest of her statements, which was overruled. Later, counsel moved for a mistrial on this ground, arguing that those statements had not been included in the state's pretrial motion. The State responded that its questions on redirect examination were in direct response to the questions asked

by counsel on cross-examination, because counsel's questions left the misleading impression that this was all the victim had said during the interviews and that was not the case. The trial court agreed with the State and denied counsel's motion for a mistrial.

¶ 103     The State reiterates its argument on appeal, and we agree. The common-law "completeness doctrine" provides that, if one party introduces part of a statement, the opposing party may introduce the remainder or so much of the remainder as is required so that the trier of fact is not misled. *People v. Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 66. Admission of evidence under this doctrine is limited to evidence that is relevant, material, and regarding the same subject at the same time. The decision about whether to admit evidence under the completeness doctrine is left to the sound discretion of the trial court. *Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 67.

¶ 104     In the case at bar, without the information elicited on redirect examination, the jury would have been left under the misleading impression that, during four interviews with the detective, the victim had failed to say a word about being raped, although she described her assailant's pushing his way through her door, putting a gun in her mouth, and dragging her immediately up the stairs to her bedroom.

¶ 105     In his reply brief, defendant argues that the completeness doctrine does not apply here because there were four different interviews. However, defense counsel did not limit his questions on cross-examination to specific interviews. For example, counsel asked: "In *any* of her interviews did she indicate that her assailant pushed through the door and dragged her up the stairs immediately?" (Emphasis added.) The detective replied simply: "Yes." Having failed to distinguish among interviews on cross-examination, defendant cannot now complain on appeal that the State followed up by doing the same.

¶ 106 Where the defense threw open the door to questions that the State had carefully kept shut on direct examination, we cannot find that the trial court abused its discretion by overruling counsel's objection.

¶ 107 VI. Sixth Amendment Claims

¶ 108 Having examined all of defendant's other alleged trial errors, we reach his confrontation clause claims. Defendant claims that reversal is warranted where the trial court admitted out-of-court statements by the victim, even though she was unavailable to testify at trial and was never subject to cross-examination.

¶ 109 A. Standard of Review

¶ 110 Neither party discusses the appropriate standard of review for the type of claim in front of us, namely a claim that the trial court admitted a hearsay statement in violation of the sixth amendment. Generally, evidentiary rulings are within the discretion of the trial court and will not be reversed unless the trial court abused its discretion. *People v. Clark*, 2018 IL App (2d) 150608, ¶ 23. However, our supreme court and various appellate court decisions have acknowledged that sometimes evidentiary rulings are reviewed *de novo* on appeal. *Clark*, 2018 IL App (2d) 150608, ¶ 23 (citing *People v. Purcell*, 364 Ill. App. 3d 283, 293 (2006), citing *People v. Caffey*, 205 Ill. 2d 52, 89 (2001)).

¶ 111 Both *Spicer*, 379 Ill. App. 3d at 451, and *Purcell*, 364 Ill. App. 3d at 286, examined the same type of claim, namely whether the admission of hearsay violated the sixth amendment, and articulated the following standard of review. A reviewing court will defer to the trial court's evidentiary ruling, unless the trial court's exercise of discretion has been frustrated by an erroneous rule of law. *Spicer*, 379 Ill. App. 3d at 451; *Purcell*, 364 Ill. App. 3d at 293.

¶ 112 B. Confrontation Clause

¶ 113    The sixth amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI. This part of the sixth amendment is commonly known as the confrontation clause and applies to the states through the fourteenth amendment. *People v. Stechly*, 225 Ill. 2d 246, 264 (2007).

¶ 114    In 2004, in the watershed case of *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court "fundamentally altered its approach to confrontation clause analysis." *Stechly*, 225 Ill. 2d at 264-65. Before *Crawford*, the United States Supreme Court had held that the sixth amendment permitted the introduction of hearsay statements by unavailable declarants, so long as the admitted statements had " 'adequate "indicia of reliability." ' " *Stechly*, 225 Ill. 2d at 264 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)).

¶ 115    In *Crawford*, this long-held standard changed. The United States Supreme Court held, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford*, 541 U.S. at 68-69. In the case at bar, all parties acknowledge that there was no opportunity for cross-examination. Thus, a key question is whether the victim's statements were "testimonial" under *Crawford* and its progeny.

¶ 116    However, as our own state supreme court observed, "the *Crawford* Court explicitly declined to define what exactly makes a statement 'testimonial.' " *Stechly*, 225 Ill. 2d at 266. Although the United States Supreme Court in *Crawford* noted several possible definitions of the word "testimonial," it expressly declined to adopt one. The *Crawford* Court stated: "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Crawford*, 541 U.S. at 68.

¶ 117     With respect to the meaning of the word "testimonial," the *Crawford* Court did provide

this guidance: "Whatever else the term covers, it applies at a minimum [(1)] to prior testimony at

a preliminary hearing, before a grand jury, or at a former trial; and [(2)] to police interrogations."

*Crawford*, 541 U.S. at 68. The first term is relatively easy to define; the second—not so much.

¶ 118     In *Davis v. Washington*, 547 U.S. 813, 821-24 (2006), the United States Supreme Court

revised its prior "at a minimum" holding about police interrogations. In *Davis*, the Court found

that, while some responses to police interrogation were testimonial, some were not. See *Davis*, 547

U.S. at 821-24. Drawing a dividing line between the two, the *Davis* Court explained: "Statements

are nontestimonial when made in the course of police interrogation under circumstances

objectively indicating that the primary purpose of the interrogation is to enable police assistance

to meet an ongoing emergency." *Davis*, 547 U.S. at 822. However, responses to police

interrogation "are testimonial when the circumstances objectively indicate that there is no such

ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past

events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.

¶ 119     Application of the above quotes from *Davis* required a court to determine (1) whether

the questioning qualified as police questioning and (2) whether the primary purpose of the

questioner was to establish past events. *Davis*, 547 U.S. at 822; *Spicer*, 379 Ill. App. 3d at 453.

With respect to the first issue, the Court left for another day the question of "when statements made

to someone other than law enforcement personnel are 'testimonial.' " *Davis*, 547 U.S. at 823 n.2.

In the case at bar, a number of the challenged hearsay statements were made to medical personnel.

¶ 120     With respect to the second issue, the *Davis* Court listed four factors that indicate the

primary purpose was to meet an ongoing emergency rather than to establish past events: (1) the

declarant "was speaking about events *as they were actually happening*" as opposed to speaking

hours after the events occurred; (2) the statement was "a call for help against a bona fide physical threat" and in response to the ongoing emergency; (3) the statements were "necessary to be able to *resolve* the present emergency"; and (4) the declarant was not "responding calmly" and was instead giving "frantic answers," which showed a lack of formality. (Emphases in original.) *Davis*, 547 U.S. at 827; *Spicer*, 379 Ill. App. 3d at 453-54.

¶ 121    In a subsequent case, *Michigan v. Bryant*, 562 U.S. 344, 366 (2011), the Court stated in *dicta* that "whether an ongoing emergency exists is simply one factor—albeit an important factor" in determining the primary purpose of an interrogation. The Court noted that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." (Emphasis in original.) *Bryant*, 562 U.S. at 358. However, in the case before it, the Court held that the statements were not barred by the confrontation clause because the primary purpose of the interrogation was to enable a police response to an ongoing emergency. *Bryant*, 562 U.S. at 377-78. In reaching this holding, the Court stressed the informality of the situation, where the police arrived in the aftermath of a shooting and posed fluid questions rather than "a structured interrogation." *Bryant*, 562 U.S. at 377.

¶ 122    In sum, when we consider the totality of the circumstances surrounding these questions, we consider, among other things, who was the questioner, what was the primary purpose of the interrogation, whether the purpose of the questions was to meet an ongoing emergency, and the level of formality or informality of the interrogation itself. See *Bryant*, 562 U.S. at 369 ("In determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances.").

¶ 123                              C. Statements at Issue

39

¶ 124   Defendant alleges confrontation clause violations from the admission of testimony by

(1) Christopher Daly, a paramedic with the Chicago Police or Fire Department, stating that he arrived at the scene at 8:30 p.m. and that, while the victim was in the ambulance and he was assessing her injuries, she told him that a man bit her, stuck his penis in her mouth, and was holding her down and that she fought him off;

(2) Mandy Baker, a registered nurse in the Trauma Unit at Stroger Hospital, stating that E.M. told her at 10:10 p.m.[6] that her neighbor had attacked her, hit her in the face, had vaginally penetrated her with his penis, and bit her right inner thigh, as well as multiple other places;

(3) Dr. Tai Holland, a medical resident who was working on a rotation in the trauma unit at Stroger Hospital, stating that he encountered the victim at 10:10 p.m. and that she told him that a man had forced entry into her home, knocked her down on her back, put a gun in her mouth, hit her, bit her, and raped her by placing his penis in her vagina and in her mouth;

(4) nurse Mattes, the sexual assault nurse examiner, stating that she encountered the victim at 11 p.m. and that the victim said that a gentleman whom she knew from the neighborhood came to her door trying to sell her some socks and, when she said no and tried to close the door, he knocked her over, hit her, bit her, put a gun in her mouth, and raped her.

---

[6]The nurse testified that she first documented the statements at 10:40 p.m. but that she first spoke to the victim at 10:10 p.m. The nurse documented that the victim stated that the assailant put a gun in her mouth, but defendant is not challenging on appeal the admission of that particular statement, which was brought out on cross-examination by his own attorney.

¶ 125    The nurses and the doctor at the hospital testified that they first encountered the victim only after the victim had been released from the emergency room into their unit. Nurse Baker testified that she contacted nurse Mattes, the sexual assault nurse examiner, to come up to perform the rape kit, which nurse Baker acknowledged was "for evidence collection."

¶ 126                              D. Paramedic

¶ 127    We discuss the paramedic separately from the other medical personnel because the statements made to him were made on the scene and much closer in time to the offense.

¶ 128    Like the United States Supreme Court in *Davis*, we need not decide whether a paramedic with the Chicago Police or Fire Department comes within the ambit of law enforcement, for reasons we explain below. Daly testified initially: "I am a paramedic for the Chicago Police Department." However, when asked how long he had worked as a paramedic, he answered: "Ten years for Chicago Fire Department, and paramedic for 12 years." Then, he was asked if, on the day of the offense, December 13, 2019, he was working as a Chicago Fire paramedic, and he said "yes."

¶ 129    Whether Daly was working as a paramedic for the Chicago Police or Fire Departments, we need not decide whether he came within the ambit of law enforcement, because we find that the statements made to him were nontestimonial on other grounds. The United States Supreme Court in *Davis* also avoided making a decision about the ambit of the police for a similar reason. In *Davis*, the Court declined to decide whether 911 operators fell within the ambit of law enforcement. *Davis*, 547 U.S. at 823 n.2. Instead, it proceeded with the rest of its analysis, ultimately deciding on other grounds that the statements at issue were not testimonial. *Davis*, 547 at 823 n.2, 828-29 (the Court concluded from all the circumstances that the primary purpose of the

41

questions at issue was to meet an ongoing emergency and therefore the statements were not testimonial).

¶ 130     In *Davis*, the Court set forth the following dividing line between testimonial and nontestimonial statements: they are nontestimonial when the primary purpose is to enable assistance to meet an ongoing emergency; they are testimonial when there is no ongoing emergency and the primary purpose is to prove past events potentially relevant to criminal prosecution. *Davis*, 547 U.S. at 822. In the case at bar, the paramedic's primary purpose was to respond to an ongoing emergency, namely ascertaining the condition of his 91-year-old patient and its causes, so that doctors could later render accurate and appropriate treatment.

¶ 131     Daly, the paramedic, testified that he arrived at the scene at 8:30 p.m. When he arrived, he observed an elderly woman sitting at the top of a set of interior stairs, on the second floor, who was "very stressed out," "almost near hysterical." The victim did not want anyone to touch or talk to her; "[s]he was just shaking and seemed very scared." Daly and his partner, Anthony Heard, were able to coax her to come down the stairs, step outside, and sit in a chair, which they had brought and used to transport her into the ambulance. While Daly was assessing her injuries inside the ambulance, he asked "what happened," and she told him how she received her injuries: namely, that a man bit her, stuck his penis in her mouth, and held her down and she fought him off. The victim explained that his holding her down and her fighting him off was why she was "hurt all over." After observing a deep cut in her right inner thigh that went almost to the bone, Daly went back inside the building, because he wanted to ask the offender what he had used. Daly explained that the doctors would want to know what type of knife was used and whether it was clean or dirty, when they treated her. When Daly asked defendant what type of knife he used to cut the victim, defendant replied that he did not use a knife and that he bit her. Daly explained that, due to the

42

victim's "demeanor" and "mental state," he did not want to do too much, so he covered all of her wounds lightly with gauze, covered her with blankets, and transported her to the hospital, where they arrived at 9 p.m.

¶ 132    A comparison of the facts here to the facts in *Spicer* establishes that the victim's remarks to the paramedic in our case fall on the nontestimonial side of the line. In *Spicer*, an elderly rape victim told a doctor the next day at the hospital that she had been tied and raped. *Spicer*, 379 Ill. App. 3d at 454. The *Spicer* court held that there was "no doubt that the primary purpose" of the *Spicer* victim's statement was "to 'prove past events' rather than to 'meet an ongoing emergency.' " *Spicer*, 379 Ill. App. 3d at 453. Applying the four factors set forth in *Davis*, 547 U.S. at 827, this court found (1) that, far from talking about ongoing events, the *Spicer* victim was relating an event that had occurred the day before, (2) that her statement was not a cry for help because she was safe in a distant hospital, (3) that her statement was not intended to resolve a present emergency because she did not want to see a doctor and the police waited seven hours before transporting her, and (4) that nothing in the record indicated that she was frantic when speaking to the doctor. *Spicer*, 379 Ill. App. 3d at 453-54.

¶ 133    By contrast, in the case at bar, (1) the victim was still at the crime scene and relating events that had just happened; (2) her statement was made after having just been carried to an ambulance, when defendant was still on the scene and the victim was shaking and very scared; (3) her condition presented the paramedic with an ongoing emergency, namely the need to stabilize her; and (4) the paramedic testified that the victim was "near hysterical," indicating a low level of formality. Thus, we find that the circumstances of Daly's questions indicate that his "primary purpose" was to enable him "to render assistance to meet an ongoing emergency," namely a shaking and scared victim, and that the whole situation lacked the level of formality needed to

qualify as testimonial. See *Davis*, 547 U.S. at 828 ("[T]he circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency."); *Bryant*, 562 U.S. at 377 ("the situation was fluid" and, thus, lacked the formality that would have alerted the speaker to the possible future prosecutorial use of his statements).

¶ 134    We make this finding although Daly testified that his partner was "doing the documentation." Daly explained that he, Daly, was the paramedic and that his job was to assess the injuries while his partner's job was to do the "documentation." His partner generated a one-page report, which Daly read over and signed. The report included information such as the victim's condition and vital signs, which would then be provided to the treating physicians.

¶ 135    On cross-examination, when Daly was asked whether he included "any additional relevant information for a police investigation," Daly responded ambiguously: "[i]f it needs to happen that way." On cross-examination, when asked if he wanted to know if a knife was used because the doctors would want that information, he responded unequivocally: "Yes." In the next question, when asked if "that would also be information that the police may want to know," he acknowledged: "[i]t could be useful, yes." Daly confirmed that, as a paramedic, he worked regularly with the police, in that he responded to scenes and the police were often present. Daly also acknowledged that his partner had written in the report what the victim was saying about the offense, namely that the offender had bitten her and had put his penis in her mouth.

¶ 136    However, there is no indication that their report was intended as a substitute for victim testimony, as opposed to a medical record intended to enable accurate treatment once they reached the hospital and doctors. Daly's acknowledgement that their report "could be useful" to the police

was not enough to suggest that the victim's statement was "procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at 358.

¶ 137                               E. Hospital Personnel

¶ 138    By contrast, the hospital personnel spoke to the victim after her condition had already been stabilized and after she had been released from the emergency room. The emergency had passed, and her statements were more akin to the rape case described in *Davis*, 547 U.S. at 828, and the statements by the rape victim at the hospital in *Spicer*, 379 Ill. App. 3d at 453-54, which were found inadmissible. See *Stechly*, 225 Ill. 2d at 299 (our supreme court found that statements by a sexual abuse victim to a nurse in an emergency room were "unquestionably" testimonial under *Davis*). Thus, defendant is correct that these statements were testimonial and should have been inadmissible as violating the confrontation clause.

¶ 139    However, we need not reverse based on confrontation clause violations that were harmless in light of duplicative and other, properly admitted evidence. As the parties agree, *Crawford* violations are subject to a harmless-error analysis. *Patterson*, 217 Ill. 2d at 428 ("*Crawford* violations are subject to harmless-error analysis."); *Spicer*, 379 Ill. App. 3d at 456 (applying harmless-error analysis to a confrontation clause violation); *People v. Thompson*, 349 Ill. App. 3d 587, 594 (2004) (same). The State bears the burden of proof. *Patterson*, 217 Ill. 2d at 428. An error is harmless if it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. *Spicer*, 379 Ill. App. 3d at 456; see *People v. Nitz*, 219 Ill. 2d 400, 410 (2006) (an error is harmless if "the result would have been the same absent the error").

¶ 140    There are

> "three different approaches for measuring error under this harmless-constitutional-error
> test: (1) focusing on the error to determine whether it might have contributed to the

45

conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Patterson*, 217 Ill. 2d at 428.

¶ 141 Defendant argues, that, without the inadmissible testimony, the jury would not have found him guilty of each of the three counts for which he was convicted, namely (1) aggravated battery to a person 60 years or older, (2) aggravated criminal sexual assault for contact between his penis and the victim's vagina, and (3) aggravated criminal sexual assault for contact between his penis and the victim's mouth.

¶ 142 Turning to the aggravated battery count, defendant argues that, without the hearsay testimony from the hospital personnel that he bit her, the evidence would have been insufficient to prove it. However, the evidence that defendant bit the victim was overwhelming (1) where defendant himself admitted to the paramedic that he bit her, in an admission that remains unchallenged on appeal; (2) where the bite marks on her body were documented in photos of "semicircular patterned" wounds, as testified to by Dr. Holland; (3) where the victim told the paramedic that defendant bit her; and (4) where the identity of the only possible perpetrator was overwhelmingly established, as we discuss below.

¶ 143 With respect to both the sexual assault and battery counts, the evidence was overwhelming regarding who the offender was. At trial, the issue was not "who" but "what" was done. The overwhelming identity evidence included (1) the neighbor's testimony about hearing defendant's voice coming from the victim's doorway asking where the victim had gone immediately after the victim had run to the neighbor's home seeking help; (2) the neighbor's testimony that, when he opened his door to the victim, the victim was hysterical, bleeding, and

stating " 'I been raped. And he still in my house. I been raped. He still in my house' ";
(3) defendant's presence at the top of the stairs in the victim's home after the police arrived and yelled for anyone inside to come out and the victim's yelling "that's him!" when she observed defendant at the top of the stairs; (4) defendant's admission to the paramedic that he bit the victim; and (5) the surveillance video that placed defendant in the victim's home when the offenses occurred. On appeal, defendant makes no arguments that there could have been another possible offender. In his reply brief, defendant concedes that "there was no dispute at trial about the identity of the culprit." Thus, identity is a nonissue and, to the extent that the State proves that the victim was, in fact, sexually assaulted and battered, then the evidence is overwhelming that it was defendant.

¶ 144    Defendant argues that he was identified only as a possible donor of the DNA on the victim's oral and vaginal swabs. However, this argument overlooks the fact that identity is conceded and that male DNA was present in both places.

¶ 145    The injuries all over the victim's body corroborate her statement to the paramedic that she was physically fighting him off of her body, as did the evidence of the crime scene with its broken table, with defendant's fingerprint on it, and the victim's blood on the carpet and walls. Further, her statements to the hospital personnel that she was raped and that his penis was in her mouth were duplicative of admissible statements that she made to her neighbor, the paramedic, and the responding officer.

¶ 146    With regard to the sexual assault counts, we find, beyond a reasonable doubt, that the jurors would not have reached a different verdict absent the error, after (1) viewing the photos of the brutal injuries all over the victim's body, which evidenced a woman in a desperate struggle;

(2) learning of the male DNA in the 91-year-old's mouth and vagina;[7] (3) being informed by nurse Mattes that the nurse's vaginal exam of the postmenopausal 91-year-old revealed blood in the victim's vagina and an abrasion to the entrance of the victim's vagina, which were both indicative of trauma; and (4) hearing of the victim's admissible statements of both "rape" and oral penetration, in particular Officer's Olsen's testimony on redirect examination that "[s]he told me that he stuck his penis in her mouth and vagina." Thus, we have no doubt that, given this substantial other evidence, the result would have been the same absent the error. *Nitz*, 219 Ill. 2d at 410 (an error is harmless if "the result would have been the same absent the error").

¶ 147    For all the foregoing reasons, we find harmless any confrontation clause violations due to the admission of hearsay statements related by the hospital personnel.

¶ 148                                    V. Sentencing

¶ 149    Because we affirm defendant's conviction, we turn to the issue that he raises regarding his sentencing. Defendant argues that his cumulative 54-year sentence is excessive, where it amounts to a *de facto* life sentence for a defendant who was 55 years old at the time of the offense, where he has been a lifetime Chicago resident, and where he is in poor health. The trial court imposed two consecutive 27-year sentences on the sexual assault counts and a 10-year concurrent sentence on the aggravated battery, for a total sentence of 54 years. On appeal, defendant asks us to reduce his sentence to the 12-year statutory minimum or to another appropriate amount pursuant to Illinois Supreme Court Rule 615(b)(4), which permits the reviewing court to "reduce the punishment imposed by the trial court."

---

[7]This is particularly true where defendant concedes on appeal that "there was no dispute at trial about the identity of the culprit."

¶ 150   Defendant acknowledges that whether a sentence is excessive is a question that we may review only for an abuse of discretion. "It is well settled that the trial court has broad discretionary powers in imposing a sentence ***." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court receives such deference because it is in a better position than the reviewing court to view, evaluate, and weigh "such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Stacey*, 193 Ill. 2d at 209. Our supreme court has admonished its lower courts not to "substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Stacey*, 193 Ill. 2d at 209. Generally, a sentence within the applicable sentencing range, as this one was, is presumed proper. *People v. Walker*, 2021 IL App (4th) 190073, ¶ 75.

¶ 151   Nonetheless, this discretion is not without limitation, and a reviewing court may reduce a sentence that is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 209-10. Thus, for example, our supreme court found that the imposition of two consecutive 25-year sentences on a defendant who "momentarily grabbed the breasts of two young girls" was manifestly disproportionate and an abuse of discretion. *Stacey*, 193 Ill. 2d at 210. The supreme court exercised its discretion to reduce his sentence to two consecutive 6-year sentences, for a total of 12 years, instead of the 50-year total that was originally imposed. *Stacey*, 193 Ill. 2d at 211.

¶ 152   In the case at bar, defendant's 54-year total sentence is similar in length to the 50-year total sentence reduced by our supreme court in *Stacey*. However, this was no "momentar[y] grab[ ]" as in *Stacey*. See *Stacey*, 193 Ill. 2d at 210. The photos of the 91-year-old victim with missing chunks of flesh are hard to view. Her body looks like it was ravaged by a man-eating animal. At the sentencing hearing, the trial court noted defendant's prior criminal history,

including that he was on mandatory supervised release for aggravated assault when the acts on the present victim were committed. Defendant had a total of four prior felony convictions, including the aggravated assault conviction for which he was on supervised release. We simply cannot find on these facts that no person would take the view that the trial court did. See *Jones*, 2025 IL App (1st) 230771, ¶ 116.

¶ 153                                  CONCLUSION

¶ 154      For the foregoing reasons, we affirm.

¶ 155      Affirmed.

*People v. Brown*, 2025 IL App (1st) 230772

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CR-60014; the Hon. Peggy Chiampas, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Bryon M. Reina, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Matthew Connors, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |